Case No. 25-1734

---

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

Amro Farid,

*Plaintiff-appellant*

v.

Trustees of Dartmouth College,

*Defendant-appellee*

---

On Appeal from the United States District Court for the District of New Hampshire, Civil Action No. 1:23-cv-00426-SM

---

**BRIEF OF THE DEFENDANT-APPELLEE, TRUSTEES OF DARTMOUTH COLLEGE**

---

Counsel for Trustees of Dartmouth College:

Pierre Chabot, Esq., No. 1143452
Stephen Zaharias, Esq., No. 1190225
Devine, Millimet & Branch, P.A.
111 Amherst Street
Manchester, NH 03101
603-695-8780
pchabot@devinemillimet.com
szaharias@devinemillimet.com

Date: November 21, 2025

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Please see the Rule 26.1 Disclosure Statement filed by Trustees of

Dartmouth College ("Dartmouth") on August 19, 2025. *See* Fed. R. App. Pro. 26.1.

**TABLE OF CONTENTS**

Rule 26.1 disclosure statement……………………………………………………..2

Table of contents……………………………………………………………….……3

Table of authorities…………………………………………………………………6

Jurisdictional statement……………………...…………….…………………..10

Statement of issues presented for review…………….….……………..10

Statement of the case..………………………...…………………..…….……..11

    I.      The record concerning Farid's tenure decision………………...…11

            A.  Vikrant Vaze's promotion to associate professor with tenure……14

    II.     The record concerning research misconduct allegations against Farid………………………………………….………16

            A.  The IV-ACOPF paper and initial allegations………….…………16

            B.  Dartmouth's initial assessment of Mr. Hegde's claims…………..17

            C.  The Inquiry Panel's review and recommendation……..……….18

            D.  The work of the Investigation Committee………………….19

            E.  The role of Henrike Frowein in the research misconduct proceedings………………………………..25

            F.  Dartmouth's outreach to the National Science Foundation………..25

            G.  Dartmouth's action following the Investigation Committee's report…………………………..26

    III.    The record concerning Dartmouth's motion to compel compliance with the stipulated ESI Protocol………….……26

Summary of Argument…………………………………………..………………..28

Argument…………………………………………………………………………..30

    I.      Standard of review………………………………………………..30

    II.    The district court properly granted summary
           judgment on Farid's discrimination claims…………………………31

           A. Professor Vaze is not a valid comparator……………..…..……...32

           B. Farid's proffer concerning his tenure process
              and the "unfriendly working environment"
              is not connected to his national origin or
              religion, nor to his tenure vote…………………..……..…….37

                1.  The procedural issues relating to Farid's tenure
                    application did not involve any violation or
                    misapplication of Dartmouth's policies………………………38

                2.  The "unfriendly environment" evidence does not
                    permit an inference of pretext or discrimination……………..40

           C. Conclusion……………………………………………………….43

    III.   The district court properly granted summary
           judgment on Farid's retaliation claims…………………………….44

           A. Dartmouth did not deny Farid access
               to the Overleaf repository…………………….…..…..……...47

           B. The Investigation Committee considered
              Farid's ACOPF analysis…………………………………….48

           C. The decision not to secure an expert to review
              Farid's 311-page analysis was made by the
              independent Investigation Committee…………….…………..49

D.  The Investigation Committee's decision was
    not in any way a split decision………………………….………...50

E.  Dartmouth's request that Farid add Mr. Hegde as an
    author on the *Heterofunctional Graph Theory Toolbox*
    paper was consistent with the Investigation
    Committee's findings and Farid's judicial admissions………….52

F.  The Investigation Committee did not expand
    the scope of its investigation…………………………………54

G.  Alexis Abramson was required to submit
    Hegde's complaint to the Provost to be
    analyzed under the RMP………………………………………..57

H. Conclusion…………………………………………………58

IV.    The district court did not abuse its discretion by
       compelling Farid to produce metadata that
       he agreed to produce…………………………………………...58

Conclusion………………………………………………….………..60

Certificate of compliance………………………………………………….61

Certificate of service……………………………………………………61

# TABLE OF AUTHORITIES

### I.    Cases.

*Audette v. Town of Plymouth*, 858 F.3d 13 (1st Cir. 2017)………………………..30

*Borges v. Serrano-Isern*, 605 F.3d 1 (1st Cir. 2010)……………….….………...31

*Brook Village North Associates v.*
*General Electric Co.*, 686 F.2d 66 (1st Cir. 1982)……………………….……….53

*Brown v. Trustees of Boston University*,
891 F.2d 337 (1st Cir. 1989)…………………………………………………43

*Cahoon v. Shelton*, 647 F.3d 18 (1st Cir. 2011)…………...…………….…………30

*Chavda v. Univ. Sys. of N.H.*,
2014 U.S. Dist. LEXIS 103197 (D.N.H. 2014)………….…….….…..……...34-35

*Cocuzzo v. Trader Joe's E. Inc.*, 121 F.4th 924 (1st Cir. 2024)…………….……..33

*Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23 (1st Cir. 2008)…..………...….…33

*Gerald v. Univ. of P.R.*, 707 F.3d 7 (1st Cir. 2013)………………………………..51

*González-Bermúdez v. Abbott Labs. P.R. Inc.*,
990 F.3d 37 (1st Cir. 2021)…………………………………………………33

*Guldseth v. Family Med. Assocs. LLC*,
45 F.4th 526 (1st Cir. 2022)…………………………………………………46

*Hatcher v. Bd. of Trs. of S. Ill. Univ.*,
829 F.3d 531 (7th Cir. 2016)………………………………………….…….34

*In re Subpoena to Witzel*, 531 F.3d 113 (1st Cir. 2008)………..………...……..58-59

*Ing v. Tufts Univ.*, 81 F.4th 77 (1st Cir. 2023)…………………….………...39, 49

*Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217 (1st Cir. 2013)….….30-31, 57

*Jenkins v. Hous. Court Dep't*, 16 F.4th 8 (1st Cir. 2021)…………………..……..58

*Kassaye v. Bryant College*, 999 F.2d 603 (1st Cir. 1993)………..……………..…..38

*Lang v. Wal-Mart Stores East, L.P.*,
813 F.3d 447 (1st Cir. 2016)……………………………….…………45, 54

*Mariani-Colon v. Dep't of Homeland Sec.*,
511 F.3d 216 (1st Cir. 2007)…………………………………………………58

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3rd Cir. 2007)…………………………49

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)………..….…..…28, 42

*Mercado v. Hyannis Air Serv.*,
2025 U.S. App. LEXIS 24455 (1st Cir. 2025)…………………………………45

*Mirabella v. Town of Lexington*, 64 F.4th 55 (1st Cir. 2023)………..…………..57

*Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670 (1st Cir. 1996)……………………31

*Pearson v. Mass. Bay. Transp. Auth.*,
723 F.3d 36 (1st Cir. 2013)……………………………………………….41-43

*Pina v. Children's Place*, 740 F.3d 785 (1st Cir. 2014)………..……..…......…..31, 35

*Quintana-Dieppa v. Dep't of the Army*,
130 F.4th 1 (1st Cir. 2025)……………………..………..…………......…..43, 45

*Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*,
181 F.3d 15 (1st Cir. 1999)……………………………….………………..39

*Roy v. Correct Care Sols., LLC*,
914 F.3d 52 (1st Cir. 2019)……………………………………….……………57

*Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*,
673 F.3d 1 (1st Cir. 2012)…………………………………….……………..30

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,

788 F.3d 25 (1st Cir. 2015)…………………………………………………..52

*Stratton v. Bentley Univ.*, 113 F.4th 25 (1st Cir. 2024)……………...…..44, 45, 52

*Taite v. Bridgewater State Univ. Bd. Of Trs.*,
999 F.3d 86 (1st Cir. 2021)…………………………………………………..42

*Theidon v. Harvard Univ.*, 948 F.3d 477 (1st Cir. 2020)…………...….36, 43, 48, 52

*Torrech-Hernandez v. GE*, 519 F.3d 41 (1st Cir. 2008)………..………..…30, 35-36

*Ugurhan Akturk Kosereis v. Rhode Island*,
331 F.3d 207 (1st Cir. 2003)……………………………………………………40

*United States v. One Motor Yacht Named Mercury*,
527 F.2d 1112 (1st Cir. 1975)…………………………………...…..……...60

*Vázquez-Rivera v. Figueroa*, 759 F.3d 44 (1st Cir. 2014)…………………………52

*Villanueva v. Wellesley College*,
930 F.2d 124 (1st Cir. 1991)……………………………….…………31-32, 43

*Vives v. Fajardo*, 472 F.3d 19 (1st Cir. 2007)…………………………………..50

*Young v. Wells Fargo Bank, N.A.*,
717 F.3d 224 (1st Cir. 2013)………………………….……..…………………47

## II.    Other authorities.

Fed. R. App. Pro. 10(b)(2)…………………………………………………………..60

Fed. R. App. Pro. 26.1……………………………………………………………..2, 3

Fed. R. App. Pro. 28(b)(3)………………………………………………………….11

Fed. R. App. Pro. 30(a)(2)………………………………………………………..11

Fed R. Civ. Pro. 36(b)………………………………………………………….53

28 U.S.C. § 1367…………………………………………………….…………….10

42 U.S.C. § 1870(a)………………………………………………………………….17

42 U.S.C. § 1870(c)………………………………………………………………….17

45 C.F.R. §§ 689.4(d)………………………………………………………………..17

## JURISDICTIONAL STATEMENT

Farid's jurisdictional statement is incomplete. Specifically, Dartmouth notes that this Court has supplemental jurisdiction over Farid's state law claims, Counts II and IV of the complaint, pursuant to 28 U.S.C. § 1367.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court correctly granted summary judgment to Dartmouth on Farid's discrimination claims where the undisputed evidence shows that the only factors driving his tenure denial were issues with his teaching and scholarship.

2.      Whether the district court correctly granted summary judgment to Dartmouth on Farid's retaliation claims where the undisputed evidence shows that Dartmouth was obliged to, and did, follow its Research Misconduct Policy and Procedures when Farid's former graduate student complained that Farid failed to acknowledge his work on a research paper.

3.      Whether the district court acted within its discretion when it compelled Farid to abide by the terms of a stipulated ESI Protocol.

## STATEMENT OF THE CASE

Dartmouth is dissatisfied with Farid's Statement of the Case, and accordingly offers its own in this brief. *See* Fed. R. App. Pro. 28(b)(3). Dartmouth hopes to assist the Court by succinctly summarizing the record below and pointing the Court to several factual citations that were not provided by Farid's statement.

### I.    The record concerning Farid's tenure decision.

Farid joined the faculty of the Thayer School of Engineering at Dartmouth College ("Thayer") in 2015 as an Associate Professor on the tenure track. ECF Doc. 1 at ¶ 6; ECF Doc. 6-1 at ¶ 6;[1] *see* Fed. R. App. Pro. 30(a)(2) ("Parts of the record may be relied on by the court or the parties even though not included in [an] appendix."). The Handbook of the Faculty of Arts and Sciences specifically contemplates that faculty can be appointed at this rank without tenure. App. at 272. Farid's initial appointment letter notified him that he would be eligible to apply for tenure after six years. App. at 620. Farid received two, one-year extensions of his tenure clock, such that he could have deferred applying for tenure until the 2022-2023 academic year, but after consultation with the Dean and Associate Dean of Thayer, he elected to stand for tenure during the 2020-2021 academic year. Farid's

---

[1] References to Farid's appendix and sealed appendix are cited as "App. at __" and "S. App. at __," as appropriate. Dartmouth's supplemental appendix is cited as "D. Supp. App. at __." The addendum to Farid's brief is cited as "Add. at __." Finally, references to filings with the district court that do not appear in an appendix or addendum are cited as "ECF Doc. __."

Brief at 7; S. App. at 50-51. Farid submitted his tenure dossier in October 2020. ECF Doc. 1 at ¶24; ECF Doc. 6-1 at ¶24; D. Supp. App. at 13-15. To achieve tenure at Dartmouth, "[s]pecific evidence of outstanding performance in scholarship and teaching is essential." App. at 271.

Concerns about Farid's abilities as a teacher were longstanding and well-documented. App. at 620-21, 626. The leadership at Thayer advised him of these concerns, and although his teaching scores improved between 2016 and 2020, they declined "precipitously" following the Fall 2020 term. *Id*. at 627-28.

As part of his tenure dossier, Farid provided a CV that listed his grant funding. App. at 278-329, 431-48; *id*. at 250-53. His largest grant, from the National Science Foundation ("NSF"), was listed in this submission. App. at 325-26. His submission did not disclose the "EAGER" designation of this grant; "EAGER" grants are not as competitive as more traditional NSF grants. D. Supp. App. at 9-12, 16-19; S. App. at 46-47.

On April 7, 2021, the tenured faculty at Thayer met to discuss Farid's tenure case. The faculty discussed numerous concerns about his tenure case before voting, including: poor teaching evaluations, which some faculty members described as "abysmal," as well as negative student comments; the fact that Farid had only received smaller grants and few peer-reviewed, competitive grants; Farid's failure to identify the "EAGER" designation of his NSF grant; the high rate of self-

citations in Farid's published works; and the less-supportive external review letters that Farid received from objective reviewers. S. App. at 39-49; App. at 343.[2]

Nobody mentioned Farid's religion or national origin during the faculty's deliberations. S. App. at 37-49, *passim.* The faculty voted by secret ballot, with eighteen faculty members voting against granting tenure, three faculty members voting for tenure, and three faculty members abstaining. S. App. at 50.

After the faculty deliberated and voted, Dean Alexis Abramson submitted the tenure case to the Committee Advisory to the President ("CAP"). *Id.* She did not recommend denying tenure, instead recommending that Farid be afforded an additional year to resubmit his tenure case despite the negative vote of the faculty. *Id.* at 50, 57. The CAP and Dartmouth's President, however, elected to follow the strong recommendation of the faculty, and denied Farid's tenure application. S. App. at 58-59. This resulted in a one-year terminal appointment. S. App. at 60.

Farid appealed this outcome on two bases: first, he alleged that there were procedural issues that could have affected the outcome of his case. App. at 369-72. A Review Committee sided with Farid on this issue, largely because it found that the Dartmouth Handbook did not clearly enough warn tenure applicants that a

---

[2] Farid claims that the "tenure committee's reasons [denying him tenure] were student evaluations, funding, and that his external letter writers were collaborators." Farid's Brief at 8. The record does not support this reading. S. App. at 37-49.

tenure denial would result in a "terminal appointment"—in other words, that tenure was a "one bite at the apple" proposition. App. at 373.

Farid also appealed his tenure denial on the grounds that it violated Dartmouth's anti-discrimination policies. Dartmouth's Institutional Diversity and Equity office engaged an outside investigator, and after reviewing her report, denied this appeal. App. at 374-75. On November 30, 2021, Farid filed an administrative charge with the New Hampshire Commission for Human Rights, asserting that his tenure denial was discriminatory on the basis of his Muslim religion and his Arab-American national origin. App. at 357-68. He amended this charge on November 9, 2022 to add allegations that the research misconduct proceedings described below were retaliatory. ECF Doc. 1 at ¶80; ECF Doc. 6-1 at ¶80. He removed the claim from the Commission on or about August 21, 2023 and filed a lawsuit in the district court on September 11, 2023. ECF Doc. 1 at ¶87; ECF Doc. 6-1 at ¶87.

### A. Vikrant Vaze's promotion to associate professor with tenure.

The year before Farid applied for tenure, a transportation engineer named Vikrant Vaze applied for, and was granted, tenure at the Thayer School of Engineering. S. App. at 252-68. According to Farid's affidavit in opposition to his summary judgment motion, which Farid did not cite in his briefing below, Professor Vaze is of Indian descent and is not a Muslim. App. at 639.

14

Professor Vaze had an impeccable record as a teacher at Thayer. His student evaluation scores were nearly all below 2.0 (with a lower evaluation score being better), "mak[ing] him among the most highly regarded teachers at Thayer." S. App. at 253. "Student reviews [for Professor Vaze were] very good or higher. . . students universally praised him for being organized, responsive to student comments, and attentive in office hours. . . . The letters [from students were] highly positive about Prof Vaze's impact on their learning and their careers, citing his intellect, deep understanding, high academic standards as teacher and mentor, and eagerness to pass on his knowledge to them." S. App. at 160-61, 163.

All the external reviewers who wrote letters for Professor Vaze strongly supported his tenure application; letter-writers with whom he had collaborated in the past, and letter-writers who had never collaborated with Professor Vaze, were all similarly supportive. S. App. at 254-55, 265-68. Professor Vaze also had ample, prestigious external funding to support his research program. S. App. at 159, 176, 184, 190, 193-94, 252-55. At the time the faculty deliberated on his tenure application, he was the Principal Investigator on six active grants, including an extremely prestigious and selective NSF CAREER award. *Id.*; S. App. at 254. The Thayer faculty voted 22-0 in support of Professor Vaze's tenure case, and Dean Abramson recommended that Professor Vaze be promoted to Associate Professor with tenure. S. App. at 252.

II.    **The record concerning research misconduct allegations against Farid.**

### A. The IV-ACOPF paper and initial allegations.

On December 27, 2021, Farid published a research paper in the journal *IEEE Access*, entitled *A Profit-Maximizing Security-Constrained IV-AC Optimal Power Flow Model & Global Solution* (the "IV-ACOPF paper"). App. at 449. On January 18, 2022, a former graduate student of Farid's, Prabhat Hegde, submitted a complaint to Dean Abramson, alleging that Farid had failed to acknowledge Mr. Hegde's contribution to the paper. S. App. at 91-95; App. at 399-401, 404-05.

Beginning in the Fall of 2019, Farid began working with Mr. Hegde. S. App. at 70. In early November 2020, Mr. Hegde began working on a research project that would ultimately result in the publication of the IV-ACOPF paper. *Id*. Mr. Hegde performed significant work on this project from early November 2020 through February 2021, exchanging dozens of messages with Farid concerning the substance of the research, and performing significant drafting to advance the manuscript. S. App. at 65-74, 77-83, 88-89.

Farid was critical of the pace and quality of Mr. Hegde's work, and in January, 2021, noted that he would have to "relegate [Mr. Hegde] out of the *first author* position" on the IV-ACOPF paper if his work did not improve. S. App. at 90 (emphasis added). Mr. Hegde continued to work on the research and manuscript, but he ultimately left Farid's laboratory in March 2021. S. App. at 70.

16

Throughout his time in Farid's laboratory, he and Farid had collaborated on the IV-ACOPF paper, and other research papers, via an online document editing program known as "Overleaf." S. App. at 69-79, 87-89. Mr. Hegde retained ownership of the Overleaf repository for the IV-ACOPF paper after leaving Farid's laboratory. App. at 697; Farid's Brief at 12.

Dartmouth's Research Misconduct Policy and Procedures (the "RMP") govern the resolution of complaints of research misconduct, including allegations of plagiarism. App. at 467-85;[3] *see also* App. at 394; ECF Doc. 1 at ¶54; ECF Doc. 6-1 at ¶54. Dartmouth is obliged by federal law to promulgate and follow policies, like the RMP, to respond to allegations of research misconduct because of the federal funds it receives in support of its research. *See, e.g.*, 42 U.S.C. § 1870(a) & (c); 45 C.F.R. §§ 689.4(d).

**B. Dartmouth's initial assessment of Mr. Hegde's claims.**

Pursuant to the plain language of the RMP, the Provost or his designee[4] was obliged to perform a preliminary assessment Mr. Hegde's allegations to determine whether, if true, they implicated the definition of "research misconduct," and

---

[3] The RMP defines "research misconduct" as "fabrication, falsification, or plagiarism . . . Plagiarism is the appropriation of another person's ideas, processes, results or words without giving them appropriate credit." App. at 472.

[4] The Provost, David Kotz, delegated responsibility for the misconduct case against Farid to Vice Provost for Research, Dean Madden. S. App. at 199.

whether they were sufficiently credible and specific to warrant the next step, which would be an "Inquiry." App. at 476-78. Dean Madden, who was not aware of Farid's tenure appeal or his lawsuit,[5] reviewed the allegations, and prepared a recommendation for Alexis Abramson, the "responsible Dean," to approve; his initial assessment was that an Inquiry was warranted. App. at 706-07. Alexis Abramson approved this recommendation. Dean Abramson is the only Thayer faculty member whose position on Farid's tenure case is reflected in the record, and she did not advocate for denying tenure.[6] S. App. at 50-57.

### C. The Inquiry Panel's review and recommendation.

The next step under the RMP is the formation of an Inquiry Panel, which determines whether an "Investigation" is warranted. App. at 476-81. If a reasonable basis exists to conclude that the conduct at issue falls within the definition of "research misconduct," and if preliminary information-gathering and fact-finding shows that the allegations may have substance, the matter is advanced to an Investigation. *Id*. In Farid's case, the Inquiry Panel consisted of three faculty

---

[5] Vice Provost Madden was aware that there was a dispute between Farid and the Thayer School, but he was not aware of the nature of the dispute, and according to Dartmouth's standard procedures, he was segregated from any communications about Farid's tenure dispute or lawsuit, at least until after the Inquiry Panel issued its draft report and Farid mentioned the lawsuit in his response. App. at 414-16.

[6] The faculty at Thayer voted on Farid's tenure application by secret ballot. S. App. at 50. There is no record in the discovery material in this case of how any particular faculty member voted.

members who were not involved in Farid's tenure case, and who were not implicated in any way by the litigation. App. at 411; S. App. at 96-97; *compare* S. App. at 37 (listing Thayer faculty present during tenure decision).

The RMP also requires that Dartmouth "sequester" all relevant research records during the Inquiry. App. at 478-79. There is nothing in the RMP requiring Dartmouth to provide sequestered records to a respondent during the Inquiry phase, or the Investigation that may follow; it is only after an Investigation occurs, and a draft report is issued, that a respondent is entitled to "a copy of, or supervised access to, the evidence on which the [draft Investigation Committee] report is based." App. at 483.

The Inquiry Panel in Farid's case determined that an Investigation was warranted. S. App. at 98-100. Under the RMP, the Inquiry Panel is independent; Dartmouth can only accept its recommendation, or request a revision—the Provost or designee does not have the ability to reject the Panel's recommendation. App. at 420-21.

### D. The work of the Investigation Committee.

Vice Provost Madden accepted the Inquiry Panel's recommendation, and worked with his staff to assemble an Investigation Committee, consisting of Andrew Campbell and Prasad Jayanti, who were professors in Dartmouth's Computer Science Department, as well as Kenneth Loparo, a professor in Energy

19

Systems Engineering from Case Western Reserve University. S. App. at 66. None of these faculty had been involved in Farid's tenure case, and they were unaware of Farid's litigation, at least for the first several months of the investigation. S. App. at 37; App. at 493-95, 509-18, 524-29, 797-98.

At the initial meeting of the Investigation Committee, Vice Provost Madden noted that "we don't want to open the frame that doesn't impact the case. For example, unprofessional behavior, bad mentoring, wasting money. These issues fall into a different bucket and need to be kept out of the research misconduct process." S. App. at 214. However, he was clear that these issues could "be discussed [by the Investigation Committee] and addressed outside [the research misconduct] process later." *Id*.; App. at 406-09, 417-19, 430. The Investigation Committee, like the Inquiry Panel, is independent. App. at 483-84. Dartmouth's Provost cannot decide what evidence the Investigation Committee, or the Inquiry Panel, considers to be relevant. App. at 406-07, 430. The Provost is required to defer to the Committee's decision-making. *Id.*

The Investigation Committee reviewed significant evidence, interviewed Mr. Hegde about his allegations, and met on multiple occasions to discuss the matter in 2023 and 2024. S. App. at 65-78, 101-23. The Committee repeatedly requested Farid's interview. S. App. at 67-68, 77. He repeatedly refused to sit for an interview, claiming that an unnamed medical issue prevented him from

20

participating "authentically" in the RMP process. S. App. at 77. He also refused to engage with Dartmouth's 504/ADA office, which attempted to assess his apparent request for an accommodation during the RMP process. *Id.*

Rather than sitting for the requested interview, Farid submitted a 311-page written response that the Investigation Committee reviewed, but could not understand. S. App. at 67. Although Ms. Frowein discussed the possibility that Dartmouth could retain an outside consultant, Huron Consulting, to attempt to analyze the document for them, App. at 739, the Investigation Committee chair was not comfortable engaging and relying on an outside consultant. App. at 872-74.

Farid offered to answer questions about his 311-page analysis in writing. S. App. at 77. The Investigation Committee, which is obliged to "interview" respondents, App. at 482, did not engage in a written exchange of this nature as it deprived the Committee of the ability to interact with Farid in real time, to pose timely follow-up questions, and to assess Farid's credibility. S. App. at 77; App. at 491-92, 525, 879, 884-85.

In the spring to summer of 2024, the Investigation Committee disbanded without issuing a decision. S. App. at 67-68; App. at 493-503; S. App. at 122-23. The members of the Investigation Committee were concerned about the manner in which Farid had interacted with them, including his failure to sit for an interview,

Case: 25-1734    Document: 00118372719    Page: 22    Date Filed: 12/01/2025    Entry ID: 6768841

and his submission of a mostly incomprehensible 311-page document in "lieu of" an interview. App. at 493-95, 509-19, 524-29; S. App. at 67-68. The Committee members, by this time, had learned about the existence of Farid's lawsuit, and they were concerned that they could become targets of the litigation. *Id*. They were additionally concerned about the way Farid had interacted with Mr. Hegde, particularly his lawyer's transmission of a demand letter to Mr. Hegde's home, threatening litigation if Hegde did not grant him access to evidence in the research misconduct matter. *E.g.*, App. at 515-19; S. App. at 67.

Professor Loparo eventually agreed to return to the Investigation Committee in the summer of 2024. S. App. at 67-68; App. at 493-503. Mark Barnes, a partner at Ropes & Gray LLP, and a former Senior Research Officer and Senior Associate Provost for Research at Harvard University, who serves on the faculty at Yale Law School, was then appointed to the Investigation Committee. S. App. at 67-68. The reconstituted Investigation Committee consisted entirely of individuals from outside of Dartmouth. *Id*.

In its new form, the Investigation Committee continued its review. On October 18, 2024, the Committee issued a draft report that contained its initial conclusions. S. App. at 130-49. The draft report was provided to Farid, and to Mr. Hegde, for comments, and they both commented. S. App. at 85-88. The

22

Investigation Committee considered these responses, and issued a final report on December 12, 2024. *Id*. at 65, 85-89.

After reviewing all the available evidence, the Investigation Committee concluded that Farid did *not* commit research misconduct based on the distinction between "plagiarism" and "authorship disputes." S. App. at 65, 88-89. This distinction is not universally observed, and Dartmouth's policy does not require that authorship disputes be decided separately from claims of research misconduct. App. at 395-401. Indeed, Dartmouth's standard procedure is to look at all relevant policies, to decide if the research misconduct policy, the authorship guidelines, "or both" are implicated when it receives a complaint. App. at 862-64.

Despite the Investigation Committee's determination that the evidence did not support a claim of plagiarism, the Committee provided its observations about what it had learned during the Investigation:

> Prof. Farid's conduct in regard to denying authorship credit to Mr. Hegde, or at least acknowledging that Mr. Hegde contributed to the Paper, was inappropriate and unprofessional in regard to his responsibilities and role as a Dartmouth faculty member and mentor. . . . Prof. Farid's behavior toward his student [was] reprehensible and his submission of a collaborative work without proper authorship attribution or acknowledgement [was] a breach of professional ethics. The Committee believes that Mr. Hegde deserves authorship credit, or an acknowledgement at the least, for his months of hard work and overall contribution to the Manuscript and Paper. . . . Additionally, this Committee refers the allegation that Prof. Farid retaliated against Mr. Hegde for Mr. Hegde's filing of his Complaint—by removing Mr. Hegde from additional academic papers on which Mr. Hegde contributed—to the Provost's Office for additional review.

23

S. App. at 65, 88.

Given what it learned, the Committee recommended the Provost consider limiting Farid's future appointments at Dartmouth, and his ability to conduct sponsored research in conjunction with Dartmouth faculty members; it also recommended that the Provost consider contacting scholarly journals where Farid had published additional pieces on which Mr. Hegde had worked[7] but had not received authorship credit or acknowledgment. S. App. at 78-83, 88-89. These recommendations, while not specifically required under the RMP, were in keeping with the way that misconduct investigations are conducted at other universities. App. at 531-46.

Professor Loparo testified that he agreed with the inclusion of these recommendations in the final report—he "allowed [them] to go in the final report. That is a fact." App. at 761. He further testified that Mark Barnes did not have any more of a vote than he did on the Committee. App. at 761-62. Professor Loparo agreed that the Committee should "recommend [in the final report] that Farid list

---

[7] In the course of its investigation, the Committee had been alerted to the fact that Farid had originally submitted at least two other scholarly articles for publication with Mr. Hegde's name included as an author; after Hegde made the research misconduct complaint, Mr. Hegde was removed as an author and the pieces were subsequently published without naming him or acknowledging his contributions. *E.g.*, S. App. at 78.

24

Hegde as a coauthor or at a minimum acknowledge him for his contributions to the Paper." S. App. at 248.

**E. The role of Henrike Frowein in the research misconduct proceedings.**

Henrike Frowein, the Director of the Office of Research Integrity at Dartmouth, supported and facilitated the work of the Investigation Committee, but she was not a member of the Committee. App. at 711-15; Farid's Brief at 11. She had no vote, and indeed the Committee rejected her suggestion that it make more forceful findings about whether Mr. Hegde deserved authorship credit or an "acknowledgment." S. App. at 65, 88-89, 245.

**F. Dartmouth's outreach to the National Science Foundation.**

Because Mr. Hegde's salary was paid out of Farid's NSF grant funds, Dartmouth was required to inform NSF once it determined an Investigation was warranted. App. at 348-50. NSF concurred that an Investigation was required, and delegated the responsibility for the Investigation to Dartmouth. S. App. at 124-28; App. at 847-50.

After Hegde had been paid, but before the research misconduct proceedings were initiated, Farid retroactively changed the source of Hegde's salary support in Dartmouth's accounting system. S. App. at, *e.g.*, 68-69, 76-77. As Ms. Frowein testified, Dartmouth "ha[s] reporting requirements. If a research misconduct investigation is open and the research *was* federally funded or *is* federally funded,

we have a requirement to inform the federal sponsor." App. at 847 (emphases added). Farid adduced no evidence that his retroactive decision to change the source of Mr. Hegde's salary payments relieved Dartmouth of the obligation to notify NSF.

**G. Dartmouth's action following the Investigation Committee's report.**

Dartmouth, via its Provost, David Kotz, contacted Farid to ask him to reach out to the journal *IEEE Access* to add Mr. Hegde as an author on the IV-ACOPF paper, and one other paper that had been previously submitted to that journal with Mr. Hegde listed as an author. S. App. at 150. Farid refused to do so. *Id.* at 151-52. There is no evidence in the record that Dartmouth took any action on the Investigation Committee's other recommendations.

Through his failure to timely answer requests for admission, Farid has judicially admitted that the second article referred to above, the *Heterofunctional Graph Theory Toolbox* paper, was submitted for publication listing Hegde as an author. *See* ECF Doc. 35-2 at 3, 40; ECF Doc. 36; Add. at 3-4.

**III.    The record concerning Dartmouth's motion to compel compliance with the stipulated ESI Protocol.**

Farid's counsel stipulated to an "Agreement Concerning the Production of Physically Stored and Electronically Stored Information" (the "ESI Protocol"). S. App. at 4-8, 13-24, 26; App. at 101, 111, 122, 127, 134, 138. The ESI Protocol required that any ESI produced by either party include load files that would allow

the receiving party to receive discoverable information concerning, *e.g.*, the author, the dates and times of editorial changes, and other similar information about each document. S. App. at 13-22. The ESI Protocol also required parties to produce email threads as single documents (to avoid the need to review email conversations piecemeal), and it required the parties to produce emails together with all attachments. *Id.*

Farid did not comply with this Protocol. Add. at 3. Counsel met and conferred extensively about this topic and repeatedly informed Farid's counsel of the importance of this information, and repeatedly refused to waive the requirements of the ESI Protocol. App. at, *e.g.*, 101, 111, 122, 127, 134, 138; S. App. at 26-27. When Farid refused to comply with his counsel's own stipulation, Dartmouth filed a motion to compel. App. at 18-33. Farid objected, App. at 150-63, arguing in part that the proportionality factors in Rule 26(b)(1) weighed against the production of the requested metadata as required by the ESI Protocol. App. at 152-53. The Court held a status conference on June 4, 2025, during which Farid's counsel conceded that it would only cost a few thousand dollars to comply with the ESI Protocol.[8]

---

[8] Farid did not obtain a transcript of this status conference as part of this appeal, but he has not disputed that his counsel made this representation. ECF Doc. 60 at 2, n.2; *see* Farid's Brief at 47-49.

The district court issued an order on June 5, 2025 requiring Farid to provide "as promptly as is practical, the metadata related to document production, as agreed in the ESI Protocol." Add. at 3. Farid filed a motion for reconsideration, and Dartmouth timely objected. App. at 892-900, 930-33. The district court granted summary judgment, mooting Farid's motion for reconsideration. S. App. at 749.

## SUMMARY OF THE ARGUMENT

The district court properly granted summary judgment on Farid's discrimination and retaliation claims. Farid failed to adduce sufficient evidence to satisfy the pretext prong of the *McDonnell-Douglas* burden-shifting framework for either claim, and failed to adduce any evidence that the ultimate reason for his tenure denial or the research misconduct proceedings involved discrimination or retaliation.

Farid failed to provide evidence that a valid comparator outside his protected class was treated better than he was in the tenure process; his proposed comparator had a dramatically better record of teaching and scholarship than Farid's. Farid also fails to connect his religion or national origin, or the Thayer faculty's vote denying him tenure, to the alleged "unfriendly work environment" that he claims existed. Moreover, any procedural error that occurred in the tenure process was generally applicable to all faculty and did not disadvantage him. There is no evidence or reasonable inference that the legitimate, non-retaliatory reasons that

28

Farid was denied tenure – *i.e.*, issues with his teaching and scholarship – were a sham and that the true reason was Farid's national origin or religion.

Similarly, Farid did not offer any specific facts to show that Dartmouth's legitimate, non-retaliatory reason to initiate and conduct research misconduct proceedings against him – its receipt of a detailed and credible complaint of conduct that potentially implicated the RMP – was pretext and that retaliatory animus was the motivating factor. Farid also fails to provide proof that any protected conduct caused anything that occurred in the course of the research misconduct proceedings against him. Much of Farid's argument is premised upon a mischaracterization of the summary judgment record, and he ignores the undisputed fact that Dartmouth followed its RMP or deviated from it only in Farid's favor. As with Farid's discrimination claims, there is no trial-worthy issue on his retaliation claims.

Finally, although the discovery issue is moot if this Court affirms the district court's grant of summary judgment, the district court properly exercised its discretion in ordering Farid to produce metadata to accompany the documents he had already produced in discovery; Farid's counsel agreed to the ESI Protocol that specifically required the production of this metadata, and he submitted no record that would support his proportionality objections to living up to his own agreement.

## **ARGUMENT**

### I.    Standard of review.

This Court reviews "the district court's grant of summary judgment de novo," and can "affirm summary judgment on any basis apparent in the record." *Audette v. Town of Plymouth*, 858 F.3d 13, 20 (1st Cir. 2017) (quotations omitted); *see Cahoon v. Shelton*, 647 F.3d 18, 22 (1st Cir. 2011). "Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Audette*, 858 F.3d at 19 (quotation omitted). "Material facts are those which might affect the outcome of the suit under the governing law, and an issue is genuine if there is evidence that would allow a reasonable jury to find for the non-moving party." *Id*. at 19-20 (quotations omitted).

Farid can only "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 9 (1st Cir. 2012) (quotation omitted). A "conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden," as the "party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his claim." *Id*. (quotations omitted); *see Torrech-Hernandez v. GE*, 519 F.3d 41, 47 (1st Cir. 2008). "A

30

plaintiff's failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013); *see Borges v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). Although reasonable inferences are drawn in the non-moving party's favor, an "inference is reasonable only if it can be drawn from the evidence without resort to speculation." *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996) (quotation omitted).

Discovery orders like the one compelling Farid to abide by the terms of the stipulated ESI Protocol are reviewed "under an abuse of discretion standard." *Pina v. Children's Place*, 740 F.3d 785, 790 (1st Cir. 2014). This standard is "not appellant-friendly," and this Court "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." *Id.* at 791 (quotations omitted).

## II.    The district court properly granted summary judgment on Farid's discrimination claims.

Farid's discrimination case founders because in a tenure denial case, "a plaintiff must convince a trier of fact, by a preponderance of the evidence, that the defendant's articulated reasons for denying tenure were 'obviously weak or implausible,' or that the tenure standards for prevailing at the tenure decisions were 'manifestly unequally applied.'" *Villanueva v. Wellesley College*, 930 F.2d 124, 129

31

(1st Cir. 1991) (quotation omitted). He cannot meet this standard. The only comparator he points to is not a valid comparator; Professor Vaze's record of teaching and scholarship was dramatically better than Farid's. Moreover, Farid fails to connect his religion and national origin, or the tenure vote, to the "unfriendly work environment" that supposedly existed. And although Farid points to procedural errors in his tenure case, he does not point to evidence of any inconsistent application or violation of any of Dartmouth's policies. Indeed, the only procedural issue that is discernible from the record resulted in Dartmouth *granting* Farid a second chance at tenure because it agreed that its tenure policies were not sufficiently clear. On the record before the Court, there is no reasonable inference that can be drawn that Farid was denied tenure because of his religion or national origin.

### A. Professor Vaze is not a valid comparator.

Farid's argument concerning pretext focuses on Professor Vikrant Vaze, who was awarded tenure the year before Farid's application was denied. Farid's Brief at 37-44. The district court properly concluded, however, that evidence about Professor Vaze did not permit an inference that the Thayer faculty's reasons for denying Farid's tenure application were pretext for discrimination.[9] As the

---

[9] Farid argues that the district court "did not expressly rule that Vaze is, or is not, a comparator." Farid's Brief at 38. A plain reading of the district court's order belies this argument. S. App. at 734-35.

Handbook of the Faculty of Arts and Sciences at Dartmouth notes, every tenure candidate must "present an outstanding record both as a scholar and a teacher . . . judgment by current and former students and by faculty colleagues is a necessary part of weighing the Candidate's performance." App. at 272. The only evidence before the Court is that Professor Vaze presented such a record, and Farid did not.

"To successfully allege disparate treatment, a plaintiff must show that others similarly situated to [him] in all relevant respects were treated differently by the employer." *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) (quotations omitted). "The comparison cases need not be perfect replicas, but they must closely resemble one another in respect to relevant facts and circumstances." *Id.* (quotations omitted). To support an inference of pretext, comparators must be "true 'apples to apples' comparators such that their dissimilar treatment could support an inference of discrimination." *Cocuzzo v. Trader Joe's E. Inc.*, 121 F.4th 924, 934 (1st Cir. 2024).

Professor Vaze is not "similarly situated in material respects" to Farid because Vaze had a far superior record of teaching and scholarship. *González-Bermúdez v. Abbott Labs. P.R. Inc.*, 990 F.3d 37, 44 (1st Cir. 2021) (quotation omitted). On the subject of teaching, the only evidence in the record is that Professor Vaze had a dramatically better record, with higher evaluation scores, and better support from students who wrote evaluative letters. S. App. at 160-61, 163,

33

253. Farid's teaching evaluations had plagued him for many years, App. 620-21, 626, and although his scores had increased before he applied for tenure, they declined precipitously after he applied but before the faculty deliberated. *Id.* at 627-28.

On the subject of scholarship, Professor Vaze had a better record of attracting funding to support his research. *Compare* S. App. at 254, *with id.* at 38. Professor Vaze had not overstated his achievements in his tenure submission, *id.* at 252-55, while Farid failed to note that his NSF grant funding was a lower-quality less-competitive EAGER grant. *Id.* at 55. Professor Vaze had unanimous support in external review letters, *id.* at 254-55, 265-68, while some of Farid's external review letters included neutral or negative feedback. *Id.* at 45, 54. And finally, Professor Vaze did not have an unusual number of self-citations in his published work, *id.* at 252-55, as Farid did. *Id.* at 55.

These are substantial differences, going to the core qualifications for tenure. App. at 272. The undisputed evidence about Vaze's qualifications compared to Farid's simply does not brook any inference that Dartmouth's reasoning masked pretext for discrimination. *See, e.g., Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 541 (7th Cir. 2016); *Chavda v. Univ. Sys. of N.H.*, 2014 U.S. Dist. LEXIS 103197, *12 (D.N.H. 2014) (plaintiff's proposed comparators who were granted

tenure had "student evaluations that were substantially better than [the plaintiff's]").

Farid attempts to deflect the reality that he had an inferior teaching record by arguing that "Dartmouth has acknowledged the inherent bias in [student] evaluations." Farid's Brief at 41. The cited page of the Appendix does not relate to this topic. *Id.* at 9. He may refer to an email in the record that contains an attachment entitled, "[s]tudent evaluations of teaching are deeply flawed." App. at 680. Farid's position that Dartmouth, as an institution, "acknowledges the inherent bias" of student evaluations based on this single email attachment does not withstand scrutiny. Although the Court will "draw all reasonable inferences in the nonmovant's favor, [it] will not draw <u>unreasonable</u> inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Pina*, 740 F.3d at 795 (underlining in original). There is no evidence that the author of this email or the attachment spoke for the entire institution, had analyzed the teaching evaluations at the Thayer School of Engineering, nor, critically, does the lone email attachment cited relate to any of Farid's classes. App. at 680. Farid's inventive characterization of this email attachment does not convert it into evidence that he was treated unfairly when his teaching evaluation scores were compared to those of Professor Vaze. *See Torrech-Hernandez*, 519 F.3d at 47 (on summary judgment, the court "is not obliged to accept as true or to deem as a disputed material fact,

35

each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party").

Farid also asserts that his longer list of publications suggests a superior record of scholarship to Professor Vaze's. Farid's Brief at 39-40. However, Farid ignores his colleagues' concerns about the high rate of self-citations in his publications, and fails to acknowledge Professor Vaze's differing area of expertise, which is a legitimate reason that Vaze's record was received well, despite featuring fewer published papers. S. App. at 735, n.13.

Professors Vaze and Farid presented two very different tenure cases. One featured a candidate who had an excellent record of teaching and scholarship; the other one was Farid's. It was Farid's burden to "connect the dots between [his] candidacy for tenure" and that of his proposed comparator; he has failed to do so, given their substantially different records. *Theidon v. Harvard Univ.*, 948 F.3d 477, 501 (1st Cir. 2020). As Farid has not adduced evidence that would permit a reasonable juror to conclude that he and Professor Vaze were similarly situated, Vaze's promotion is not evidence that Farid's tenure denial was discriminatory. *See id.* The district court's decision should stand.

**B. Farid's proffer concerning his tenure process and the "unfriendly working environment" is not connected to his national origin or religion, nor to his tenure vote.**

Farid raises numerous perceived slights he encountered over his career, as well as procedural issues that a Review Committee relied upon to *grant* his appeal of his tenure denial, in an attempt to animate a pretext theory. Farid's evidence, however, does not support the arguments that he attempts to make. The procedural issues he raised for the tenure Review Committee after his original application was denied did not involve any violation or incorrect application of Dartmouth's policy. Instead, the Review Committee criticized the Thayer and Faculty Handbooks, and took the remarkable step of overturning Farid's terminal appointment precisely because Dartmouth adhered to the policies it had set forth. App. at 373. This was not because of any substantive unfairness in the faculty's deliberations, but because the policy did not give Farid (or any other faculty member, S. App. at 736) enough notice about the consequences of applying for tenure.

Farid also points to a mish-mash of incidents, involving a disparate cast of Dartmouth employees, over the six years before he applied for tenure, to buttress his arguments that Dartmouth's tenure denial was discriminatory. This was the evidence that the district court aptly described as Farid's "unfriendly work environment" evidence. S. App. at 737-39. The problem with Farid's "unfriendly environment" claims is twofold. First, he offered precisely no evidence tying any

37

of these incidents to his national origin or religion, such as by pointing to similarly situated faculty members who were treated better. Second, he offered no connection between the "unfriendly environment" incidents and his tenure vote. Both failures are fatal to his claims.

### 1. The procedural issues relating to Farid's tenure application did not involve any violation or misapplication of Dartmouth's policies.

Farid argues that Dartmouth failed "to follow the tenure procedure," presumably in reference to the fact that he was not afforded enough information about the up-or-out nature of his tenure application before applying. Farid's Brief at 43. Dartmouth granted Farid's internal appeal of his tenure denial on the basis that Dartmouth's policies were not sufficiently clear, however—not because anyone had failed to follow any policy. App. at 373. Farid, however, never re-applied for tenure, instead applying to and accepting a position at the Stevens Institute of Technology. App. at 243-44.

Even if the procedural issues identified had anything to do with Dartmouth not following its own policies, Farid's argument would still founder because the summary judgment record contains no evidence connecting the timing of his tenure application to his religion or national origin. Farid provides no evidence that Dartmouth treated him differently from any other professors on these points, and certainly not differently due to his religion or national origin. *See Kassaye v. Bryant College*, 999 F.2d 603, 607 (1st Cir. 1993). In other words, these issues

were correctly analyzed by the district court: "because the Handbook was . . .

unclear on the issue, the lack of clarity about when to submit a tenure dossier was

not limited to Farid," but applied to any faculty member, regardless of national

origin or religion. S. App. at 736.

At the pretext stage, it is Farid's obligation to "prove not only that the reason

articulated by the employer" for the denial of tenure "was a sham, but also that its

true reason was plaintiff's [religion] or national origin." *Rodriguez-Cuervos v. Wal-*

*Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999). "[T]he fatal weakness in

[Farid]'s case is his failure to present any evidence that [Dartmouth]'s actions were

predicated on the basis of [religion] or national origin." *Id.*

Nor was Dartmouth's administration of its tenure policies "inexplicable and

troubling." *Ing v. Tufts Univ.*, 81 F.4th 77, 83-84 (1st Cir. 2023). Farid was

appointed as an Associate Professor position without tenure in 2015, and was

consistently informed that he needed to work to improve his record, particularly in

terms of teaching, before he would be a viable tenure candidate. App. at 620-21,

626-28. When he went up for tenure, there were still two years remaining on his

tenure clock—he was not prevented from applying earlier than the end of his

tenure clock. D. Supp. App. at 14-15. When Farid complained that Dartmouth's

policies did not give him sufficient warning that he would face a terminal

appointment if he applied for, and was denied, tenure, Dartmouth granted his

appeal and provided him another chance to apply. App. at 373. Despite his strained argument that Dartmouth violated its own tenure policies, Farid's Brief at 43, there is nothing inexplicable or troubling about the procedural aspects of Farid's tenure case, and certainly no showing that Dartmouth was "motivated by discrimination." *Ugurhan Akturk Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003).

### 2. The "unfriendly environment" evidence does not permit an inference of pretext or discrimination.

Farid has not offered evidence that he was subjected to an "unfriendly environment" because of his religion or national origin, nor does he offer even minimally sufficient evidence tying any "unfriendly" encounter to his tenure denial. Farid's failure to present evidence on these points was the reason the district court granted summary judgment, and the reason this Court should affirm that judgment.

First, Farid does not offer any evidence that he was subjected to an "unfriendly environment" because of his religion or national origin. Farid claims that in 2016, then-Dean Helble advised him not to advise a Muslim student group. App. at 221. As Farid testified, however, Dean Helble told Farid, in 2018, that his teaching evaluations were poor and Farid should not apply for tenure for at least another three years. App. at 620-21. Farid does not dispute that the reason Helble gave him for not advising the Muslim student group was to focus on his tenure

case. App. at 360.[10] As the district court correctly noted, Farid offered *no* evidence that other faculty members who advised student groups had similar problems with their teaching, which would be required before this evidence could support his pretext argument. S. App. at 737; *see Pearson v. Mass. Bay. Transp. Auth.*, 723 F. 3d 36, 40-41 (1st Cir. 2013).

Farid's position that he was denied campus energy usage information is also not based upon any minimally sufficient evidence from which a factfinder could infer discriminatory animus. Farid's Brief at 7, 44. The record he cites to, namely his own deposition transcript, does not bear the inference he tries to draw: at his deposition, Farid testified that he was asked not to serve as a mentor for a student project because the students were not performing to expectations—specifically the expectations of Professor Helble, by then the Provost of the College. App. at 622-23. Farid offers no evidence that this was not true, and as noted, Provost Helble had been consistently raising concerns about Farid's teaching at this point in time. App. 620-21. The notion that Farid was denied access to campus energy data because of this matter relies only on Farid's speculation; he offers no evidence that he was denied data, or that anyone else who did not share his protected class received similar data.

---

[10] Farid was required to swear to the contents of the Charge of Discrimination that is included in the record. *See* App. at 358.

The second problem with the "unfriendly environment" evidence is that Farid cannot connect the dots between any instance where he experienced an "unfriendly environment" and his tenure denial. Professor Helble, who is alleged to have encouraged Farid to focus on his tenure case rather than advising a religious student group, and who apparently expressed displeasure about Farid's advising work on an engineering course, did not participate at all in Farid's tenure case—he did not attend the April 7, 2021 faculty meeting, and Farid has pointed to no other evidence that he was involved in, or influenced, the faculty's deliberations or vote. S. App. at 50. And Farid has offered no evidence that the staff members with whom he emailed, complaining about their non-responsiveness to his demands for energy data, App. at 632-33, had any connection to the Thayer School of Engineering, let alone any connection to his tenure case.

The matters that Farid describes are not the kind of "convincing mosaic" that might survive the pretext stage of *McDonnell Douglas*, precisely because he offered no evidence that other faculty members outside his protected class were similarly situated and treated better. *See Taite v. Bridgewater State Univ. Bd. Of Trs.*, 999 F.3d 86, 94-97 (1st Cir. 2021). Additionally, because Farid cannot connect any of his complaints about the "unfriendly environment" to his tenure vote, he did not offer the district court the minimally sufficient evidence that would be required to permit an inference that the tenure vote was discriminatory. *See Pearson*, 723

42

F.3d at 40-41. Whether viewed in isolation or in combination, these matters are not competent evidence of pretext; they bear no logical relation to the question of whether Dartmouth believed the stated reasons for Farid's tenure denial were credible. *See Theidon*, 948 F.3d at 497. Because Farid's "attempt to show pretext amounts not even to thin evidence, but rather to no evidence at all," the district court's grant of summary judgment on the discrimination claims should be affirmed. *Quintana-Dieppa v. Dep't of the Army*, 130 F.4th 1, 16 (1st Cir. 2025).

### C. Conclusion.

"Courts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement." *Brown v. Trustees of Boston University*, 891 F.2d 337, 346 (1st Cir. 1989) (quotation omitted). And it is not the province of a court to sit as a "super tenure committee." *Villanueva*, 930 F.2d at 129.

In this case, Farid has presented the Court with no evidence that even arguably suggests that his religion or national origin were taken into account when he was denied tenure. There is a clear record that his colleagues fairly considered his record as a teacher, and his record as a scholar, and found them lacking. Farid

43

pointed to no other faculty member outside his protected class who had similar problems with their teaching or scholarship who received tenure, and provided no evidence that would permit an inference that his colleagues doubted their own judgment, or voted against him for discriminatory reasons. On this record, there is no basis to overturn the district court's ruling that Farid's discrimination claim fails as a matter of law. That ruling should be affirmed.

### III.    The district court properly granted summary judgment on Farid's retaliation claims.

As the trial court correctly observed, the undisputed evidence in the record demonstrated that Dartmouth was obliged to follow the provisions of the RMP in assessing Mr. Hegde's allegations. S. App. at 742. Additionally, Dartmouth is not disputing, for purposes of summary judgment, that Farid can establish a *prima facie* case to support his retaliation claims.

But Dartmouth was able to demonstrate (and Farid does not dispute on appeal) that it had a legitimate, non-retaliatory reason to initiate and conduct research misconduct proceedings, namely that it received a detailed and credible complaint of conduct that potentially implicated the RMP, S. App. at 91-95, 741-42, and so it is Farid's burden "to show that [Dartmouth's stated non-retaliatory] reason is pretext and that retaliatory animus was the real motivating factor" for the research misconduct proceedings. *Stratton v. Bentley Univ*., 113 F.4th 25, 42 (1st Cir. 2024) (quotation omitted). Farid is required to "elucidate specific facts which

44

would enable a jury to find that the reason given by the defendant for the adverse employment action is not only a sham, but a sham intended to cover up the employer's real motive [of retaliation]." *Quintana-Dieppa*, 130 F.4th at 14 (quotations omitted).

It is not enough for Farid to articulate a colorable argument as to how Dartmouth could have reached a different conclusion than it did. "Rather, [Farid] must present evidence from which a reasonable jury could supportably conclude that [Dartmouth]'s explanation is not just wrong, but that it is so implausible that [Dartmouth] more likely than not does not believe it." *Id*. (quotations omitted). A "reason cannot be proved to be a pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason." *Lang v. Wal-Mart Stores East, L.P*., 813 F.3d 447, 459 (1st Cir. 2016) (quotations and brackets omitted).

Retaliation claims also "require proof that the protected activity was a but-for cause of the alleged adverse action by the employer." *Stratton*, 113 F.4th at 44 (quotation omitted). Although similar evidence can support both causation and pretext, and although the causation and pretext inquiries may be similar, *see Mercado v. Hyannis Air Serv.*, 2025 U.S. App. LEXIS 24455, *16-17 (1st Cir. 2025), Farid is required to show that Dartmouth "would not have taken the adverse action but for a desire to retaliate[.]" *Stratton*, 113 F.4th at 44.

Farid still cannot point to any evidence that permits the inference that anything that occurred in the research misconduct process was, in any way, a sham. And, given the way the process was designed and implemented, with three separate steps, carried out by two independent committees, composed of individuals who were independent of each other and from Dartmouth's administration, he likewise cannot show that any step of the proceedings was carried out to retaliate against him.

Farid's primary argument on appeal is that the district court could have found sufficient evidence that the research misconduct process was conducted improperly or was "biased" against him. Farid's Brief at 26-33. These arguments all significantly mischaracterize the summary judgment record, as Dartmouth points out below.[11] In every instance that Farid raises, Dartmouth either followed its policies or, if deviating from them, it deviated to Farid's benefit—as in the instance of its decision to supply Farid access to the Overleaf repository before it

---

[11] Farid argues that the district court failed to consider evidence that he alluded to using only the word "*supra*." Farid's Brief at 33-36. Not so. As noted in this brief and in Dartmouth's summary judgment reply, the records to which Farid cited below and on appeal largely do not support his assertions or support any reasonable inferences that can defeat summary judgment. It was Farid's burden to come forward with evidence to meet Dartmouth's summary judgment motion—his "put up or shut up" moment, *see Guldseth v. Family Med. Assocs. LLC*, 45 F.4th 526, 533 (1st Cir. 2022), and Farid did not supply evidence to respond to Dartmouth's proffer anywhere in his brief.

was obliged to do so. It was incumbent on Dartmouth to perform an initial assessment of Mr. Hegde's complaint under its research misconduct policy, and to advance it in the manner it did. The district court properly recognized that Farid's summary judgment submission failed to create a trial-worthy fact issue on this matter, and so Farid cannot avoid summary judgment on his retaliation claims. S. App. at 741-46.[12]

### A. Dartmouth did not deny Farid access to the Overleaf repository.

As noted *supra* on page 19, Dartmouth's RMP does not contemplate that a respondent in research misconduct proceedings be granted access to the evidence against them until the time comes to respond to a draft Investigation Committee report. App. at 483. Farid's argument concerning Dartmouth's "failure" to provide him with the Overleaf repository, Farid's Brief at 27-28, when it was *sequestered* during the Inquiry phase, misses the mark. If anything, Farid was treated more favorably than other respondents; he was granted access to the evidence against him during the Investigation phase, even after he had sent threatening correspondence to the complainant's home to try to obtain this material. Access to the Overleaf repository was provided to him long before the RMP required that it be provided. *Compare* Farid's Brief at 12 (access to Overleaf provided in

---

[12] Farid has waived any argument that Dartmouth retaliated against him for failing to transfer research funds at his request, as he does not brief this issue. S. App. at 747-49; *see Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 239-40 (1st Cir. 2013).

September 2023), *with id.* at 16 (draft Investigation Committee report issued in October 2024). Any departure from the RMP was in Farid's favor, and so Dartmouth's actions in this regard simply cannot be relevant to a pretext theory. *See Theidon*, 948 F.3d at 499 (the "review committee's conduct . . . is devoid of the inexplicable and troubling inconsistencies that [can] give rise to a reasonable inference of pretext").

**B. The Investigation Committee considered Farid's ACOPF analysis.**

In the same vein, nothing in the RMP required the Investigation Committee to consider Farid's ACOPF analysis. Farid's Brief at 30; *see* App. at 467-85. Rather, the Investigation Committee was required to interview Farid, App. at 482, which it attempted to accomplish, but Farid refused to be interviewed and instead submitted his 311-page ACOPF analysis. S. App. at 67. Contrary to Farid's arguments, the Investigation Committee did consider the ACOPF analysis, even if they were not required to do so; however, the Committee struggled with the analysis and could not make sense of it. *Id.*; *see* App. at 503, 526-27, 546-51.

Additionally, prior to receiving the ACOPF analysis from Farid, it is undisputed that there was a "strong unanimous feeling" of the Investigation Committee that "this was a clear-cut case of research misconduct." App. at 797-98. However, in the final report, the Investigation Committee concluded – after reviewing Farid's ACOPF analysis – that research misconduct did not technically

occur. S. App. at 65-67, 88-89. Again, any departure from the requirements of the RMP here was not "inexplicable" or "troubling," but rather was to Farid's benefit. *Cf. Ing*, 81 F.4th at 83.

### C. The decision not to secure an expert to review Farid's 311-page analysis was made by the independent Investigation Committee.

Again, Farid mischaracterizes the record when he argues that "Dartmouth ignored advice by its Committee in March 2024 to retain an outside consultant to review Farid's ACOPF Analysis[.]" Farid's Brief at 30. It was the Provost's office, in the person of Ms. Frowein, that offered to employ a consultant. App. at 739; *see also* S. App. at 122 (Ms. Frowein stated that "Dartmouth will hire a consultant").[13]

The members of the Investigation Committee were the ones who decided against hiring a consultant. App. at 872-74. Given the deference that Dartmouth owed to its independent Investigation Committee, App. at 407, 430, the fact that a consultant was not hired to review Farid's ACOPF analysis does not lend itself to any inference that Dartmouth failed to follow its own policies. In fact, the RMP expressly states that it is the Investigation Committee that "shall determine whether

---

[13] Farid also asserts that there was "intervening antagonism" by Ms. Frowein. Farid's Brief at 28. However, he fails to articulate in any developed manner how Ms. Frowein's emails demonstrate a pattern of "actual antagonistic conduct or animus." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3rd Cir. 2007). This is especially so when it is undisputed that the Investigation Committee, in its final report, rejected Ms. Frowein's suggestion to make more forceful findings about whether Mr. Hegde deserved authorship credit or only an acknowledgement. *Compare* S. App. at 245, *with id*. at 65, 88-89.

experts . . . need to be consulted during the Investigation to provide special expertise regarding the analysis of evidence." App. at 482. Farid does not elucidate any facts to show how the Committee's decision not to employ an expert to analyze his written submission was intended to retaliate against him, or even that it deviated from the RMP. The faculty members who made up the Investigation Committee were not connected to Farid's tenure denial; all Farid supplies are assumptions and unsupported speculation, which are insufficient to defeat summary judgment. *See Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007).

## D. The Investigation Committee's decision was not in any way a split decision.

Farid has no record support when he claims that Professor Loparo "did not agree with" the Investigation Committee's recommendations about corrective measures that Dartmouth should consider in light of the facts they identified during their investigation. Farid's Brief at 17, 31. As an initial matter, the portion of the record Farid cites does not refer to the recommendations, at all. App. at 758. Farid's summary judgment submission did include two later, non-consecutive pages where Professor Loparo was *asked about* the Committee's recommendations to, *e.g.*, limit Farid's future research affiliations with Dartmouth, *id.* at 759, and then, on the next page of the record, he answered a *different question*, 19 pages later in his deposition transcript, concerning the description of Farid's conduct as "reprehensible." *Id.* at 760.

50

Professor Loparo testified that he might not have chosen the word "reprehensible" to describe Farid's treatment of his former student had he been the sole author of the report.[14] *Id.* However, what Professor Loparo said about the recommendations to the Provost was that he "allowed [them] to go in the final report," and further that he had equal authority to Attorney Barnes, the other Committee member who signed the report. *Id.* at 761. He wanted to know what effect the inclusion of these recommendations would have, as the Committee had concluded that Farid had not committed research misconduct. *Id.* at 761-62. He was told that the Committee should include "whatever opinion th[e] committee wants," and that the Provost would decide what to do with these recommendations. *Id.* at 762.

Furthermore, Farid did not supply *any* evidence that Dartmouth's Provost accepted the recommendations in question, other than asking Farid to have Mr. Hegde listed as an author on two papers. S. App. at 150. Given the latitude that Dartmouth was obliged to give its Investigation Committee, App. at 407, 430, and

---

[14] Professor Loparo certainly agreed that Farid's treatment of Mr. Hegde constituted a breach of professional ethics. App. at 760. Whether or not he quibbled with the choice of descriptors for Farid's misconduct, the record does not even establish a plausible basis to show that the Investigation Committee's final report was incorrect, let alone that the Investigation Committee concluded as it did because it harbored retaliatory animus. *See Gerald v. Univ. of P.R.*, 707 F.3d 7, 24 (1st Cir. 2013) (plaintiff is required to show "that the reason is pretext and that retaliatory animus was the real motivating factor").

the dearth of any evidence that Dartmouth accepted the recommendations that Farid complains of, it is unclear how the Court can draw the inference that the Committee's recommendations, or the outcome of the investigation, were in any way shams, or that they were causally related to his protected conduct. *See Stratton*, 113 F.4th at 44.

In light of the record, any suggestion that the Investigation Committee did not believe in or endorse the final report is precisely the sort of conclusory and unsupported argument that is routinely rejected when analyzing summary judgment. *See, e.g.*, *Theidon*, 948 F.3d at 506 & n.41.

**E. Dartmouth's request that Farid add Mr. Hegde as an author on the *Heterofunctional Graph Theory Toolbox* paper was consistent with the Investigation Committee's findings and Farid's judicial admissions.**

Farid is not appealing the district court's order declining to overturn his judicial admissions, which resulted from his failure to timely answer or object to Dartmouth's requests for admission.[15] *Compare* Farid's Brief, *passim*, *with* App. at 16 (noting an intention to appeal the district court's ruling on ECF Doc. 35, Farid's Motion to Amend Response to Request for Admission); *see* ECF Doc 35-2 at 1-3,

---

[15] Because he has not briefed this issue or even raised it in the statement of issues presented, the issue has been waived. *See Sparkle Hill, Inc. v. Interstate Mat Corp.,* 788 F.3d 25, 29 (1st Cir. 2015); *Vázquez-Rivera v. Figueroa*, 759 F.3d 44, 46-47 (1st Cir. 2014). The matters stated in the requests for admission are now admitted for purposes of this case, *see* Add. at 3-4, and so Farid cannot try to inject any fact issue that contradicts those admissions.

40; ECF Doc. 36; Add. at 3-4. Farid has judicially admitted that a copy of the

*Heterofunctional Graph Theory Toolbox* paper listing Hegde as the first author was

initially submitted for publication on May 8, 2020, ECF Doc. 35-2 at 3, 40; he

further admitted that he authorized this submission. *Id.* at 3. "A matter admitted

under this rule is conclusively established unless the court, on motion, permits the

admission to be withdrawn or amended." Fed R. Civ. Pro. 36(b). Courts routinely

grant summary judgment relying on facts that are deemed admitted in this fashion.

*See Brook Village North Associates v. General Electric Co.*, 686 F.2d 66, 70 (1st

Cir. 1982) ("courts have not hesitated . . . to apply the sanction of Rule 36 to

material facts that conclusively establish or preclude a party's claim").

Farid presents no evidence that Dartmouth did not believe it was appropriate

to request that Farid add Mr. Hegde's name to this paper after it was removed,

especially in the face of his judicial admissions. Moreover, Farid points to *no*

record evidence calling the Investigation Committee's recommendation about this

submission, or the Provost's subsequent request that he include Mr. Hegde as an

author on this paper, into question. The Investigation Committee considered Mr.

Hegde's interviews and the documentary evidence that he supplied during the

Inquiry phase of the proceedings and thereafter. S. App. at 71-74, 78. Farid, having

refused to sit for an interview, did not supply the Committee with any basis to

gainsay Mr. Hegde's information about this paper. Nor did he provide the Provost

53

with any information to support his position after the Provost made the request to add Hegde as an author. Instead, Farid responded to this request by demanding that, before he would even consider the request, the Provost first "provide him with the scientifically-correct sections of text and/or software code that qualify as the 'intellectual contribution' that Mr. Hegde authored, and that were retained in the manuscript submitted to IEEE Access." *Id.* at 152.

Farid bears the burden of producing evidence that Dartmouth made this request of him for sham reasons, and further that the real reason it made the request was retaliatory. *See Lang*, 813 F.3d at 459. Farid does not even have evidence that permits an inference that he was within his rights to remove his former student from the paper at issue. Given the record before the Court, there is no evidence that would allow a factfinder to infer that Dartmouth requested that Farid grant authorship credit to Mr. Hegde on this additional paper for the purpose of retaliating against him.

### F. The Investigation Committee did not expand the scope of its investigation.

Farid argues that "Dartmouth deviated from the scope of its research misconduct investigation as originally designed." Farid's Brief at 28. This argument, once again, is not borne out by the records that Farid relies upon. For example, he asserts that the Investigation Committee had already "decided that Farid's conduct did not meet the definition of research misconduct" before Mark

Barnes joined the Committee, and later "changed this direction, expanding the investigation to include the issues that Vice Provost Madden had previously told the committee not to include." Farid's Brief at 29. There is no evidence in the record that would permit these inferences.

First, Vice Provost Madden did not instruct the Investigation Committee not to *consider* issues relating to, *e.g.*, bad mentoring. Vice Provost Madden was undisputedly recorded advising the Committee that "we don't want to open the frame that doesn't impact the case. For example, unprofessional behavior, bad mentoring, wasting money. These issues fall into a different bucket and need to be kept out of the research misconduct process." S. App. at 214. This is consistent with the RMP, which requires the Investigation Committee to refer matters covered by other policies to the appropriate authority. App. at 476. But in the very next breath, he said "[h]owever, [these issues] can be discussed and addressed outside this process later." S. App. at 214.

Vice Provost Madden testified extensively that the Provost's office does not tell the Investigation Committee what evidence is relevant to a research misconduct investigation. App. at 406-07, 430. The Investigation Committee felt that assessing Farid's treatment of Mr. Hegde was important to assessing his credibility, among other things. App. at 543-44. Furthermore, Dartmouth timely disclosed Attorney Barnes as a percipient expert, and he opined that the ultimate

55

recommendations of the Investigation Committee, even though not mandated by the RMP, were in keeping with the standards observed at other universities. App. at 531-34, 571-73. Farid disclosed no experts, and offered no evidence, that Investigation Committees are forbidden from reviewing evidence, or making recommendations based on their review of the evidence, after reaching a conclusion that no research misconduct had occurred.

The RMP specifically requires that the Committee consider all "evidence relevant to reaching a decision on the merits" and instructs it to "[p]ursue diligently all significant issues and leads discovered, including any evidence of additional instances of possible Research Misconduct[.]" App. at 482. Farid did not provide the district court, or this Court, with any basis to infer that the Investigation Committee failed to follow its own rules or otherwise acted improperly based on the Vice Provost's comment at the May 2, 2023 meeting.

To the extent that Farid suggests that the Investigation Committee, as it was reconstituted in the summer of 2024, exhibited bias against him by reaching a more negative conclusion than it had reached in the preliminary stages of the Investigation, the record supports only the opposite conclusion. The Investigation Committee had reached a "unanimous" consensus that Farid's conduct likely constituted "a clear-cut case of research misconduct" before Attorney Barnes was involved. App. 797-98; *see* App. at 526-29. But it did not issue any decision or

56

report prior to receiving Farid's written submission – a report that concluded that research misconduct did not technically occur. S. App. at 65, 88-89. Farid's unsupported conjecture that the Investigation Committee changed course after two members resigned, does nothing to create a genuine issue of material fact. *See Mirabella v. Town of Lexington*, 64 F.4th 55, 58 (1st Cir. 2023).

### G. Alexis Abramson was required to submit Hegde's complaint to the Provost to be analyzed under the RMP.

It is undisputed that Alexis Abramson, who received Mr. Hegde's complaint in January 2022, S. App. at 91-95, was required to report it to the Provost. The RMP expressly requires this step. App. at 473, 477. Dartmouth's Authorship Guidelines do not spell out a different conclusion—though they do note that issues of potential plagiarism are subject to the RMP. App. at 575. The record below demonstrated that Dartmouth followed the RMP, as the district court found. S. App. at 65-66, 91, 742; App. at 348, 653-56, 705-07.

In contrast to Dartmouth's record citations, Farid provides nothing but arguments and conclusory allegations to support his position that the initiation of the research misconduct process was improper. *See Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 70-71 (1st Cir. 2019). The summary judgment stage is the "put up or shut up moment in litigation," where Farid is required to "come forward with some evidence showing a genuine dispute of material fact if he wants to get in front of a jury." *Jakobiec*, 711 F.3d at 226 (quotation omitted). Having provided no evidence

permitting a reasonable inference that Dartmouth was able to, let alone obliged to, employ the "authorship guidelines" instead of the RMP, Farid cannot show that retaliation was the but-for cause of its decision to analyze Mr. Hegde's complaint under the latter policy.

### H.    Conclusion.

Farid was obliged to do more than call into question Dartmouth's reasoning for initiating and conducting the research misconduct process following Mr. Hegde's complaint. He needed to make at least a "colorable showing that an adverse action was taken for the purpose of retaliating against him." *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007) (quotation omitted). Farid does not point to record evidence supporting such a showing. Nor did he provide the "specific facts" needed to "demonstrate any sham or pretext intended to cover up [Dartmouth's] retaliatory motive." *Jenkins v. Hous. Court Dep't*, 16 F.4th 8, 14 (1st Cir. 2021). The district court's decision on Farid's retaliation claims should be affirmed.

### IV.    The district court did not abuse its discretion by compelling Farid to produce metadata that he agreed to produce.

This discovery issue is moot if the Court affirms the district court's grant of summary judgment. If the Court reverses the district court's summary judgment decision, then it should deny Farid's appeal on this discovery issue because he cannot make the required showing that "the lower court's discovery order was

58

plainly wrong and resulted in substantial prejudice." *In re Subpoena to Witzel*, 531 F.3d 113, 117 (1st Cir. 2008) (quotations omitted). This standard "sets a high hurdle for appellants to overcome," *id.*, and Farid cannot show that the district court's decision to enforce ESI requirements that *he agreed to* was either wrong or prejudicial.

The ESI Protocol Farid agreed to specifically required identified metadata fields to be produced alongside the underlying documents. S. App. at 4-23. Farid concedes that he failed to provide this discoverable material. Farid's Brief at 47-49; *see* Add. at 3. Dartmouth raised this deficiency with Farid's counsel repeatedly before filing its motion to compel. S. App. at 26-27; App. at 101, 122, 127, 134, and 138. Under these circumstances, where Farid's counsel's own agreement created the obligation to provide metadata, the district court's decision to enforce that agreed-upon obligation cannot be "plainly wrong."

Farid also offers no record support for the position that the district court's decision to enforce the terms of the parties' agreement "resulted in substantial prejudice" to him. There is no record support for his position that he would "need to search for and re-produce tens of thousands of emails in native format." Farid's Brief at 49. There is no evidence in the record concerning the number of emails produced, the time it would take to properly re-create Farid's faulty productions, or the cost of doing so—this evidence was not presented to the district court, and it is

59

absent from the record here. It is Farid's burden to provide this Court with sufficient evidence to support his arguments. *See* Fed. R. App. Pro. 10(b)(2); *United States v. One Motor Yacht Named Mercury*, 527 F.2d 1112, 1113 (1st Cir. 1975). He has not done so, and there is no basis to overturn the district court's ruling on this discovery dispute.

## CONCLUSION

Farid has failed to make the required showings necessary to overturn any of the district court's decisions. Thus, the district court's grant of summary judgment in Dartmouth's favor on Farid's retaliation and discrimination claims, and its decision requiring Farid to produce the metadata that he agreed to produce via the ESI Protocol, should be affirmed.

Respectfully submitted,

Trustees of Dartmouth College,

By its attorneys,

DEVINE, MILLIMET & BRANCH, PA

Date: November 21, 2025

By: /s/ *Pierre Chabot*_____
Pierre Chabot, Esq., No. 1143452
Stephen Zaharias, Esq., No. 1190225
111 Amherst Street
Manchester, NH 03101
603-695-8780
pchabot@devinemillimet.com
szaharias@devinemillimet.com

60

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with all typeface, type style, spacing, formatting, and volume requirements set in this Court's rules. In particular, this brief contains 12,185 words according to the word count function of the word-processing system used to prepare this brief (excluding items noted in Rule 32(f)).

Date: November 21, 2025    By: /s/ *Pierre Chabot*_____
                                        Pierre Chabot, Esq.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, the foregoing brief was filed via the Court's electronic filing facilities, causing it to be served electronically on all counsel of record, including Farid's counsel, through the ECF system. Additionally, two paper copies will be served upon Farid's counsel.

Date: November 21, 2025    By: /s/ *Pierre Chabot*_____
                                        Pierre Chabot, Esq.