**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

Case No.
25-1734

_____

Amro Farid

Plaintiff – Appellant,
v.

Trustees of Dartmouth College

Defendant - Appellee

_____

On Appeal From A Judgment and Order of the District Court for
the District of New Hampshire

_____

**REPLY BRIEF OF THE PLAINTIFF/APPELLANT AMRO FARID**
_____

December 22, 2025                PLAINTIFF-APPELLANT AMRO FARID
                                   Joseph L. Sulman, BBO #115200
                          Law Office of Joseph L. Sulman, Esq.
                                 255 Bear Hill Road, Suite 204
                                          Waltham, MA 02451
                                            (617) 521-8600
                                       jsulman@sulmanlaw.com

1

## Table of Contents

*Table of Authorities*........................................... *3*

*Argument*...................................................... *4*

**I. Dartmouth Mischaracterizes The Record on Counts III and IV To Deny that The Research Misconduct Investigation Was Skewed Against Farid.** ....................................................... 4

    A. Dartmouth Violated The Research Misconduct Policy by Refusing The Provide Access to The Overleaf Repository Until Sept. 2023. ....................................................... 4

    B. Dartmouth Did Not Actually Review Farid's Analysis of the Overleaf Repository in His Written ACOPF Submission. ......... 6

    C. Dartmouth Has No Justification For Contacting Farid About The Heterofunctional Graph Theory Toolbox Paper, Which Was Never Investigated. ....................................................... 8

    D. The Record Demonstrates That Loparo Disagreed With Several Findings in The Final Report. ............................. 10

    E. The Evidence Shows That The Committee Went Beyond Its Original Charge. ....................................................... 11

    F. A Jury Could Easily Find "Intervening Antagonism" By Frowein That Influenced The Committee's Investigation. .... 12

**II. Dartmouth Overstates The Evidence in Its Favor on Counts I and II.** ....................................................... 15

    A. Vaze Is A Valid Comparator. ............................. 15

    B. Dartmouth Violated Its Policies and Injured Farid. ..... 21

    C. Dartmouth Discounts The Evidence of Discrimination. ..... 23

*Conclusion*.................................................... *26*

## Table of Authorities

**Cases**

*Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)............ 20

*Chavda v. Univ. Sys. of N.H.*, 2014 U.S. Dist. LEXIS 103197, at
  *11-12 (July 29, 2024) ................................... 16

*Cook v. CTC Communs. Corp.*, 2007 U.S. Dist. LEXIS 96979, at *22
  (D.N.H. Oct. 30. 2007) ................................... 11

*Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 274 n.10 (1st
  Cir. 2022) .............................................. 15

*Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 328 (1st Cir.
  1996) ................................................... 20

*Ripoli*, 123 F.4th at 575.................................... 15

*Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 96
  (1st Cir. 2021) .................................. 19, 20, 24

*Theidon*, 948 F.3d at 500.................................... 21

**Rules**

Fed.R.Evid. 802............................................. 7

**Argument**

**I.   Dartmouth Mischaracterizes The Record on Counts III and IV To Deny that The Research Misconduct Investigation Was Skewed Against Farid.**

The record shows that investigation committee members received explicit instructions from Vice Provost Madden to limit its investigation to issues concerning research misconduct and did not review the written analysis of Hegde's contribution to the ACOPF paper submitted by Farid. The record further shows that Dartmouth knew that the Overleaf repository was critical evidence and refused to share it with Farid despite his repeated requests. Yet Dartmouth insists in its Principal Brief ("App. Br.") that it "considered" the written analysis by Farid, followed the instructions given to the committee by Madden about the scope of the investigation, and provided the Overleaf repository to Farid when required to do so by the RM Policy. The record, however, undermines these assertions.

**A.   Dartmouth Violated The Research Misconduct Policy by Refusing The Provide Access to The Overleaf Repository Until Sept. 2023.**

Dartmouth continues to deny that it acted improperly by failing to provide the Overleaf repository to Farid until his lawyer sent the demand letter to Hegde in September 2021. App. Br. at 47. In fact, the RM Policy states the Inquiry Panel reviews "relevant Research Records" to determine whether an

4

Investigation should be opened and that "supervised access to the data and/or documents should be available to the Respondent and the Complainant, and to other witnesses as appropriate." App. 480. "Research records" is defined as "any data, document, computer file, compact disc, computer diskette, or any other written or non-written account or object that reasonably may be reasonably may be expected to provide evidence or information regarding the proposed, conducted, or reported research that constitutes the subject of an allegation of Misconduct." *Id.* at 472. The Overleaf repository certainly fits this definition. This provision is triggered during the Inquiry Phase, which began in May 2022, over fifteen months before Farid requested the Overleaf repository in writing from Hegde. *Id.*

The policy section relied on by Dartmouth for its contention that it shared the Overleaf repository without any improper delay is found in the investigation phase and merely says that the Respondent should be given access to the "evidence" relied upon by the Investigation Committee. *Id.* at 483. The cited provision does <u>not</u> state that this is the <u>first</u> time that the Respondent is entitled to access the evidence. Indeed, Frowein told the committee on September 20, 2023 that the repository is "considered evidence" in the investigation and

that Farid could request "read only access" through her office, which he had previously done *on two occasions.* S. App. 208-214.[1]

**B.    Dartmouth Did Not Actually Review Farid's Analysis of the Overleaf Repository in His Written ACOPF Submission.**

Dartmouth also makes the purely rhetorical argument that the Investigation Committee "considered" the ACOPF analysis provided by Farid in October 2023. App. Br. at 48. In fact, the committee simply received the submission from Farid and "puzzled over it, and ultimately could not understand it because its contents were not explained by Farid." S. App 77. This was an explicit finding in the Final Report:

> The Committee has carefully examined the submitted materials but notes that their significance, if any, is not readily identifiable and that Prof. Farid has defaulted in his responsibility to explain his submission, either in writing or verbally. In light of his refusal to appear for an interview with the Committee and his failure to provide clear written explanations for the hundreds of pages of documents he provided, Prof. Farid's "offer" to answer any written questions from the Committee has seemed, to the Committee, a hollow and phantom offer, and is inconsistent with the Committee's need, and the practice of research misconduct investigation committees at Dartmouth and elsewhere, to hold real-time, interactive interviews with the Respondent.

*Id.*

---

[1] In fact, the committee had noted the importance of the Overleaf repository at the beginning of its investigation on May 2, 2023. S. App. 214-215.

The written conclusion by the committee about Farid's purported "refusal to appear for an interview with the Committee and his failure to provide clear written explanations" disregards that he provided detailed written explanations with his analysis and told Frowein and committee members to contact him with any questions on the submission when he transmitted the analysis via email. App. 764-793; S. App 218-219. Farid explained the purpose of the submission clearly in its Executive Summary: "The object of this document is to demonstrate the provenance of '*A Proximate Maximizing Security-Constrained IV-AC Optimal Power Flow Model and Global Solution*' by Prof. Amro M. Farid published in IEEE Access." S. App. 766. Yet neither the Committee nor Frowein contacted him, even though Frowein contacted Hegde with follow-up questions on behalf of the committee several times. *Id.*; App. 733-736.

Even if the committee had legitimate confusion over the submission, the record shows that Frowein told the committee as late as March 2024 that Dartmouth was going to "hir[e] an outside consultant to review Farid's written submission." S. App. 122. Dartmouth now contends that it declined to hire the consultant because doing so would interfere with the committee's factfinding role. App. Br. at 49, citing App. 872-74. But Dartmouth only cites to former committee member Andrew

Campbell's deposition testimony for this assertion, disregarding that Frowein told the committee as a body in March 2024 that Dartmouth would "hire a consultant (Huron)" to "review the document and put a recommendation together." S. App. 122. There are no meeting minutes with Campbel after this date, as the committee disbanded and then reformed as a two-member committee with Loparo and outside attorney Mark Barnes.

Regardless of the reason, Dartmouth did not hire a consultant but ultimately appointed *its expert* Attorney Barnes to the committee when Jayanti and Campbell withdrew. Barnes and his team still did not substantively review Farid's analysis of the ACOPF paper as part of the investigation but found instead (with Loparo) that Farid's offer to answer questions to be "a hollow and phantom offer, and is inconsistent with the Committee's need, and the practice of research misconduct investigation committees at Dartmouth and elsewhere, to hold real-time, interactive interviews." S. App. 77.

The result was the same whether no outside consultant was hired.

**C.    Dartmouth Has No Justification for Contacting Farid About The Heterofunctional Graph Theory Toolbox Paper, Which Was Never Investigated.**

Dartmouth also continues to defend its erroneous decision to contact Farid on February 12, 2025 via Provost Kotz and demand that he contact IEEE Access (the peer-reviewed scholarly

8

journal that published the ACOPF paper) to correct the authorship listing for a second scholarly article, the Heterofunctional Graph Theory Toolbox paper. In fact, Dartmouth continues to assert, without any evidence, that this second paper "had been previously submitted to that journal with Mr. Hegde listed as an author." App. Br. at 26, *citing* S. App. at 150-52. Dartmouth had no evidence to support its erroneous assertion that Farid submitted this paper to IEEE Access, however, either when Kotz sent the letter to Farid on February 12, 2025 or now when it continues to insist that he did. The *only* evidence Dartmouth relies on to support this assertion is the February 12 letter from Kotz, which is inadmissible hearsay on the issue of publication. *Id.*; Fed.R.Evid. 802.

As Farid indicated in his Principal Brief, the investigation committee never asked Farid about this second paper during the investigation, a fact which Dartmouth does not deny. App. Br. at 52-54. Instead, Dartmouth seems to rely on a judicial admission in the district court that states that Farid "authorized the Heterofunctional Graph Theory Toolbox paper for publication," App. Br. at 53, ECF Doc. 35-2 at 3, 40. This admission, however, says nothing about which scholarly journal Farid submitted the paper for publication.[2] The admission, in

---

[2] Farid denied this admission after the Rule deadline and did not appeal district court's denial of his motion to allow his late

other words, provides *no evidence* to support Dartmouth's baseless assertion that Farid submitted the second paper to IEEE Access or to support Kotz's improper instruction to Farid to contact IEEE Access about this paper.

**D.    The Record Demonstrates That Loparo Disagreed with Several Findings in The Final Report.**

Dartmouth also attempts to gloss over the clear differences in opinion between Loparo and Barnes on the final investigation report. App. Br. at 50-51. The record shows that Loparo was a reluctant signatory to the final report. He testified that he "did not say that [Farid] needed to have Prabhat as a co-author" in the final report. App. 753-54. Loparo refused to say under oath that he "concurred" in the punitive measures recommended. *Id.* at 761; S. App. 88. He asked what the "impact of this report would have and does it stay internal" and since "this is outside of the scope of the research misconduct, what does that mean." *Id.* at 762. Provost David Kotz then went ahead and selected the recommendation of Barnes – the outside attorney – that there was co-authorship over the opinion of Loparo that Farid only needed

---

denial because the issue of publication alone is immaterial, particularly because the judicial admission does not state *where* Farid submitted the article for publication.

to give Hegde an acknowledgment. S. App. 150. This supports a finding that the investigation was pre-determined.[3]

### E. The Evidence Shows That The Committee Went Beyond Its Original Charge.

Dartmouth also claims, against the weight of evidence, that the Investigation Committee "did not expand the scope of its investigation." App. Br. at 54. Yet it does not deny that Vice Provost Dean Madden instructed the Committee that "unprofessional behavior, bad mentoring . . . fall into a different bucket and need to be kept out of the research misconduct process [and] can be discussed and addressed outside *this* process later." S. App. 214 (emphasis added). Dartmouth also cannot deny that the committee formed under the RM Policy as an investigation committee and was thus charged with the "formal development of a factual record and the examination of that record leading to a finding with respect to Research Misconduct." App. 471, 472, 481. The fact that Dartmouth now offers the expert opinion of one of its committee members,

---

[3] Dartmouth argues that "it is unclear how the Court can draw the inference that the Committee's recommendations, or the outcome of the investigation, were in any way shams." App. Br. at 52. The Court reviews the evidence on summary judgment in the light most favorable to the non-moving party and draws all inferences in that party's favor. The total record of the investigation, from the inception to its conclusion, easily allows the Court to draw the inference that the investigation was biased against Farid. *See Cook v. CTC Communs. Corp., 2007 U.S. Dist. LEXIS 96979, at \*22 (D.N.H. Oct. 30. 2007).*

11

Attorney Barnes, that it is common for investigation committees to go beyond their charge is not dispositive when Madden and the RM Policy both charged the committee with only investigating the issue of research misconduct.

While Dartmouth weakly contends that Farid "did not provide the district court, or this Court, with any basis to infer that the Investigation Committee failed to follow its own rules or otherwise acted improperly based on the Vice Provost's comment at the May 2, 2023 meeting," App. Br. at 56, in fact the opposite is true. The RM Policy and Madden's instructions directly contradict the course of conduct taken by the committee and Dartmouth during the investigation. Moreover, Loparo recognized in his testimony that the committee went beyond its charge as he acknowledged himself. App. at 761-62.

### F. A Jury Could Easily Find "Intervening Antagonism" By Frowein That Influenced The Committee's Investigation.

In a footnote, Dartmouth contends that Farid did not explain how the evidence of "intervening antagonism" by Frowein "demonstrate[s] a pattern of actual antagonistic conduct or animus" from her. App. Br. at 49, n. 13. In fact, the evidence shows repeated negative commentary from Frowein about Farid to members of the committee throughout the investigation. At the outset of the investigation, she told the three-member committee comprised of Loparo, Jayanti, and Campbell that they may want to

12

consider Farid's attempt to gain access to the Overleaf repository in September 2023 "as retaliation or intimidation." S. App. 216; App. 725. At the time, the committee members believed that Farid already had access to the repository. App. 726. She told the committee then that Farid was "making demands that are neither true nor acceptable in [Office of General Counsel's] and my view." *Id.* The committee members agreed at one point to ask Farid interview questions in writing and Frowein did not recall any opposition to doing so. App. 730-731. Frowein never asked Farid any written questions, however. *Id.* at 733.

In January 2024, she told the committee during a meeting that the ACOPF analysis submitted by Farid was "irrelevant and the committee has enough evidence." *Id.* at 224; She began drafting an investigation report for the committee comprised of Loparo, Jayanti and Campbell at the time that concluded with a finding of research misconduct. S. App. 227-228, App. 737. This is despite the fact that each member denies ever approving the drafting of such a report.

After Barnes joined as a committee member in August 2024, Frowein told him that "it is certainly true that [Farid] tried very hard to delay the process every step of the way." S. App. 229. On October 18, Frowein sent Farid a copy of the draft investigation report with an invitation for him to "provide written comments" to her by November 18. *Id.* at 244. When he

provided his response on November 17, she forwarded the response to Barnes and Loparo with the following commentary:

> Attached are Farid's comments to the draft investigation report plus a significant number of exhibits. Many of the exhibits have very little or nothing to do with the research misconduct matter. I am seeing many of them for the first time.
>
> The content of the comments is about what I expected. Together with the exhibits I interpret this as another attempt to pull the research misconduct matter prominently into the litigation against Dartmouth, and portrait it as a retaliatory move.

*Id.* at 243. On November 19, she forwarded Prabhat's response to the draft report with the following negative comment about Farid: "I continue to be very troubled by the retaliatory nature of Farid's actions against Prabhat. While the draft report mentions additional papers that he was removed from in the conclusion, I am wondering if the language addressing this should be strengthened. Of course this is the committee's decision." *Id.* at 245. She communicated with Attorney Barnes and spoke with him about the investigation without including Loparo. App. at 747-750.

Based on the content and tone of Frowein's conduct and communications, a reasonable jury could readily conclude that Dartmouth attempted to steer the investigation committee to a pre-determined outcome. This is shown through the records of

14

Frowein's meetings with the committee and her communications where she characterizes Farid's conduct as retaliatory and his evidence as irrelevant, among other statements.

In sum, and in combination with the evidence and argument presented in Farid's Principal Brief, the district court's order granting summary judgment on Farid's claims of retaliation in violation of Title VII (Count III) and retaliation in violation of RSA 354-A:7 (Count IV) should be reversed.

## II.  Dartmouth Overstates The Evidence in Its Favor on Counts I and II.

### A.  Vaze Is A Valid Comparator.

Dartmouth contends that Vikrant Vaze is not a comparator and that the district court made such a finding, but fails to cite to any language of the district court's decision where such a finding was made, instead referencing the court's entire two-page analysis on Vaze.  App. Br. at 32, n. 9, *citing* S. App. 734-735.[4] Dartmouth does not even cite to any case law to rebut Farid's reliance on *Ripoli*, 123 F.4th at 575, that "the plaintiff's case and the comparison cases that [he] advances

_____

4 It bears emphasis that comparator evidence is not required to prove a Title VII claim. *See Frith v. Whole Foods Mkt., Inc.,* 38 F.4th 263, 274 n.10 (1st Cir. 2022) ("Although comparator evidence may provide powerful support for a claim of disparate treatment, the existence of a similarly situated employee is not a required element of a Title VII discrimination claim.")

15

need not be perfect replicas [but] they must closely resemble one another in respect to relevant facts and circumstances." Instead, Dartmouth points to a district court decision where comparator evidence was admitted, but found to be unable to persuade a reasonable jury on the issue of disparate treatment. App. Br. at 34, *citing Chavda v. Univ. Sys. of N.H.,* 2014 U.S. Dist. LEXIS 103197, at *11-12 (July 29, 2024).

Here, the undisputed record shows Vaze and Farid "closely resemble one another in respect to relevant facts and circumstances." *Ripoli*, 123 F.4th at 575. They were in the same department and were considered by the same tenure committee in successive years. In fact, Farid had a superior publication record compared to Vaze, a higher rank – associate compared to assistant professor, and equal funding. But whether Vaze or Farid had a superior record is not actually relevant to the *evidentiary* question of whether Vaze is *admissible* as a comparator.

Dartmouth points to the fact that the tenure committee highlighted Farid's mixed record of student evaluations whereas Vaze had uniformly positive student evaluations. But the record also shows that both Vaze and Farid identified external reviewers to the tenure committee from former collaborators, but the committee only faulted Farid for this violation of norms while remaining silent with Vaze.  S. App. 55-56, 252-255. Like

16

student evaluations, this was another criterion that the committee applied to both candidates, but this time with disparate standards.

Vaze identified the following four external letter writers (among others): Profs. ███████████████████████ ███████████████████. S. App. 364. Each external reviewer submitted a letter for Vaze. *Id.* at 182-183 ███████); 178-181 (████); 172-174 (██████); 169-171 █████). According to his CV, Vaze collaborated substantially with██████, publishing eleven papers as a co-author with her. S. App. 276-77. Vaze's CV also shows five publications and one conference presentation as a co-author with ████. *Id.* at 278. Vaze's CV shows three publications with ██████. *Id.* at 276-77.[5] Vaze's CV shows one paper with ██████. *Id.* at 277.[6]

Notably, none of the tenure committee members – including Abramson – noted any conflict between these external letter writers and Vaze. S. App. 252-255. Abramson summarized the committee's discussion and vote concerning Vaze in a letter to the CAP, referring to letters "received from 8 individuals identified by the candidate and 7 individuals identified by the

---

[5] ██████ letter itself describes his collaboration with Vaze. *Id.* at 182-183.

[6] Vaze provided the tenure committee with a copy of his CV. *Id.* at 269-271.

Committee." *Id.* at 254. She quoted several positive excerpts from four letters and did not refer to any collaborations between the letter writers and Vaze either noted by herself or any committee members. *Id.* at 255. Profs. Geoff Parker and Eric Hanson, who collected the material for Vaze's tenure review and reported on his candidacy to the tenure committee, did not report any of the conflicts with the external reviewers. *Id.* at 157-168. They were both on Farid's tenure committee. *Id.* at 37.

In contrast, Abramson emphasized in a letter to the CAP concerning Farid's case that tenure committee members "noticed that four external letters writers recommended by Prof. Farid were previous co-authors [and] [l]etters from these reviewers were overwhelmingly positive." S. App. at 55. Indeed, in Abramson's letter to the CAP, the last paragraph of the section titled "Discussion of the Faculty Vote" focuses on the external review letters:

> Red flags were raised when a faculty member noticed that the four external letter writers recommended by Prof. Farid were previous co-authors. Letters from these reviewers were overwhelmingly positive. The faculty then entered into a discussion about the term "arms length reviewer," expressed worry that Prof Farid may not have been adequately coached about the underlying meaning of the term, and raised concern about the bias of these reviewers given their relationship with Prof Farid. One faculty noted that details about Prof. Farid's specific contributions to the field

18

>            were not sufficiently provided in three of
>            the four letters from his recommenders

*Id.*

During the discussion on Farid's tenure case, no one from the committee attempted to explain why the collaboration between these letter writers and Farid differed from the collaboration between Vaze and the four letter-writers that he offered one year earlier. *Id.* at 37-49. One member, Charlie Sullivan,[7] commented that "[Farid's] letters from recommended reviewers are entirely from his collaborators at MIT, and that's something that our Handbook says should not be the case." *Id.* at 46. The minutes reflect that when Abramson was asked about what type of "counsel" Farid received before submitting his tenure package, she and Associate Dean Laura Ray responded by pointing in part to "his choice to go with four reviewers that are all from MIT." *Id.* at 47.

As this evidence shows, Dartmouth applied different standards in evaluating the external reviewers submitted by Vaze and Farid and based its recommendation against tenure for Farid in part on the different standard. *See Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 96 (1st Cir. 2021) (holding that differences in application of interview criteria

---

7 The committee minutes only state the faculty members' first names when listing their comments, but the list of attendees includes a single Charlie: Charlie Sullivan.  S. App. 37.

19

and consequential differences in evaluation of staff associate at university required reversal of summary judgment);[8] *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 328 (1st Cir. 1996) ("Evidence which may be relevant to the plaintiff's showing of pretext may include application of a certain criterion to employees not within the protected category.") (Internal brackets omitted.) Under the but-for causation standard, a reasonable jury could conclude that the tenure committee reached a different conclusion but for the application of this unequal standard. *See Bostock v. Clayton Cnty.,* 590 U.S. 644, 656 (2020) ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.")

Dartmouth may contend, as implied in its principal brief, that the tenure committee's disregard of the collaboration between Vaze and his external reviewers is immaterial because Vaze's reviewers were uniformly positive. App. Br. at 15. But when communicating with the CAP about Farid, Abramson did not highlight the lack of uniformity in his external review letters;

---

[8] *Taite* also supports a holistic evaluation of the record evidence of disparate treatment rather than the district court's fragmented review. *Id.* at 94 (explaining that "the **aggregate** package of proof . . . need[s] only show that [the plaintiff's] ability to meet [his] burden turns on a genuine issue of material fact") (emphasis added).

she highlighted the fact that "four external letter writers recommended by Prof. Farid were previous co-authors," which was not mentioned in her letter to the CAP about Vaze even though it was also true, and to a more substantial level, with Vaze and his external reviewers. S. App. 55. This is the material fact for purposes of summary judgment concerning Farid's external reviewers for which there is clear evidence that the "irregularity was relevant to [and] had any bearing on [Dartmouth's] evaluation of [Farid's] tenure prospects." *Theidon*, 948 F.3d at 500.

**B.    Dartmouth Violated Its Policies and Injured Farid.**

While Dartmouth acknowledges that there were "procedural errors" in Farid's tenure case, it still asserts that Farid "does not point to evidence of any inconsistent application or violation of any of Dartmouth's policies." App. Br. at 32. The record contradicts this. Dartmouth violated or inconsistently applied several of its policies to the detriment of Farid.

Abramson and Associate Dean Laura Ray did not advise Farid on the consequences of applying early for tenure. *Id.* at 373. Ray was required to "meet with the candidate to review the procedures. *Id.* at 276. Dartmouth acknowledges (through its Review Committee) that Ray "did not appropriately explain the ramifications [to Farid] of deciding to submit the tenure dossier." *Id.* at 373. This finding was only made in October

21

2021, *id.*, after the tenure committee voted and *after* the tenure committee asked Ray and Abramson during its deliberations on Farid's candidacy: "What kind of counsel did he get about his package? Did he get any?" They collectively answered "Yes":

> Yes. I did encourage him to seek advice from people on the faculty closer to his area. He was almost offended by that. He was like, you should know or not. Part of it is looking under the hood and things are not quite as they seem to me, and then his choice to go with four reviewers that are all from MIT. All post colleague and I know the CAP would probably have trouble with that. There's another thing related to this delay that I believe he's won some fellowship and is requesting a sabbatical, and so we may not get another teaching evaluation in the next year.

S. App. at 47.[9]

This violation materially affected Farid's tenure case. Not being advised about the tenure process meant that Farid did not know about the consequences of applying early, even though he solicited information about the tenure process in his 2020

---

[9] Farid was also treated as an assistant professor rather than an associate professor, the rank under which he was appointed, resulting in him waiting six years to be considered for tenure. S. App. 271-275, 373, 620. As Abramson told the committee, "[Farid] came in as an associate professor for a reason because he came in with background. He expected to go up in three years." S. App. 48. At Dartmouth acknowledges, Farid's student evaluations of his teaching improved each year until his last year during the COVID-19 pandemic, when he received mixed reviews. Had he been treated as associate professor, he could have applied for tenure after three years when he had an upward trajectory in his teaching.

yearly review. App. at 663. Farid did not understand that a negative vote on tenure resulted in a terminal year appointment, as this procedure of the tenure process is not clearly explained in the Faculty Handbook. S. App. 373. Indeed, a few months before submitting his dossier for tenure, Farid specifically asked "[t]o get a clear indication in writing and in person **from the Thayer Dean's office** of whether [he] still remain[s] in danger of termination through a failed tenure review" and "when it is appropriate to go up for tenure." App. at 663 (emphasis added).

In attempting to discount the significance of these violations, Darthmouth contends that it "granted Farid's internal appeal of his tenure denial on the basis that Dartmouth's policies were not sufficiently clear, however—not because anyone had failed to follow any policy." This is a gross mischaracterization of the record. The Review Committee explicitly found that "the Associate Dean did not appropriately explain the ramifications [to Farid] of deciding to submit the tenure dossier" and that Farid "was treated as an assistant professor." *Id.* These findings go beyond unclear policies and directly link the treatment of Farid to the tenure decision.

### C.  Dartmouth Discounts The Evidence of Discrimination.

The record contains evidence that Dartmouth discriminated against Farid leading to his tenure review in ways that

negatively affected his preparation for tenure. Dartmouth first attempts to discount the evidence that Provost Joseph Helbe discouraged Farid from advising the Muslim student group Al-Nur by pointing to the fact that Farid acknowledged that Helble cited Farid's need to focus on his preparation for tenure as the basis for this instruction, and also testified that Helble told him that he needed to improve on his student evaluations before applying for tenure. App. Br. at 40. But these two facts do not help Dartmouth on their summary judgment motion, where the evidence must be reviewed and all inferences drawn in the light most favorable to Farid. *Taite*, 999 F.3d at 92 (record is reviewed on appeal in summary judgment in "light most favorable to the non-movant (Taite) and drawing all reasonable inferences in her favor"). Farid also offered evidence that another professor, Doug Van Citters, was allowed to advise a student rowing team while on the tenure track. App. at 618-619. In light of such evidence, the mere fact that Helble once talked to Farid about improving his teaching does not prevent a jury from also drawing an inference of discriminatory intent from Helble's instruction to Farid against advising a Muslim student group.

Additionally, Dartmouth denied Farid access to campus-wide energy systems data even though such data was critical to his research, and now denies that he submitted this evidence in the record. App. Br. at 41. In fact, the record contains emails

24

between Farid and several people at Dartmouth in January 2020 where he requested energy system data and reported repeated failures in his attempts to obtain the data. App. at 631-638; e.g., *id.* 635 ("I've tried repeatedly over my years at Dartmouth to develop collaborative links with your office. Each time, quite mysteriously, I never hear back from your office.") Preventing access to this system delayed the development of his research on such projects as the NSF Smart and Connected Communities project, which he later continued at his subsequent tenure-track position at Stevens Institute of Technology. *Id.* at 625.

In sum, and for the reasons set forth in the Principal Brief, this Court should reverse the district court's order granting summary judgment to Dartmouth on claims of discrimination based on religion and/or national origin in violation of Title VII (Count I) and in violation of New Hampshire Revised Statute Section 354-A:7 ("RSA 354-A:7") (Count II).

## **Conclusion**

For the reasons set forth herein and the reasons set forth in Farid's Principal Brief, this Court should reverse the district court's order granting summary judgment to Dartmouth on all counts of the Federal Complaint.

RESPECTFULLY SUBMITTED,

PLAINTIFF-APPELLANT AMRO FARID
By His Attorney

/s/ Joseph Sulman

Joseph L. Sulman, BBO # 115200
Law Office of Joseph L. Sulman, Esq.
391 Totten Pond Road, Suite 402
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com

December 22, 2025

26

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32(A)(7)(B)

I hereby certify that this document complies with the requirements under Local Rule 32(A)(7)(B) and has 5,441 words, excluding the Table of Contents, Table of Authorities, Certificate of Compliance, and Addendum.

I also certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionate type spaced Courier New Font using Microsoft Word 365 and 12-point font.

/s/ Joseph L. Sulman
Joseph Sulman

December 22, 2025

27

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this document, with the addendum, on counsel for Defendants-Appellants via the Court's Electronic Filing System on December 22, 2025, and that two paper copies will be served by First-Class Mail per Fed.R.App.P 31(b) as required by the Court.

/s/ Joseph L. Sulman
Joseph Sulman

December 22, 2025.

28